**DeKONING**

v.

**FLOWER MEMORIAL HOSPITAL.**

Court of Common Pleas of Ohio,
Lucas County.

No. CI92–0204.

Decided Oct. 17, 1996.

*Vesper C. Williams II,* for plaintiff.

*John M. Carey* and *Myrna A. Shuster,* for defendant.

CHARLES J. DONEGHY, Judge.

This wrongful discharge case is now before the court for judgment, findings of fact, and conclusions of law following a bench trial. Upon review of the pleadings, testimony of the witnesses, stipulated exhibits, arguments of the parties, applicable law, and an assessment of the credibility of the witnesses, the

court finds that the defendant, Flower Memorial Hospital ("Flower" or "the hospital"), is entitled to judgment and dismissal of all claims against it by the plaintiff, Margaret DeKoning.[1]

## I. INTRODUCTION

In this case, the plaintiff argues that she was wrongfully discharged when Flower terminated her employment without just cause and when it deviated from established hospital policy, embodied in its employee handbook ("handbook") and policy and procedure manuals, by terminating her employment because of her repeated tardiness without first suspending her. Flower counters that the plaintiff's employment relationship with Flower was terminable at will and, thus, Flower could fire her without cause; their relationship was not modified by the employee handbook, Flower's hospitalwide management guidelines, or departmental guidelines; Flower made no promise regarding the duration of the plaintiff's employment or conditions of termination on which she relied to her detriment; and the plaintiff's discharge was proper.

## II. FINDINGS OF FACT

1. On or before April 15, 1985, Flower made both verbal and written offers to employ the plaintiff in its pharmacy ("the pharmacy") as a "Pharmacist Technician II." She accepted both offers. She delivered a signed acceptance to the director of Flower's pharmacy, David Waller, on or about April 15, 1985.

2. On the plaintiff's first day of employment, the hospital gave the plaintiff a copy of the handbook. The handbook outlined the hospital's expectations for employee behavior and was intended for employee use. The attendance policy of the handbook reads as follows:

"One of the most important responsibilities as an employee is to be dependable and prompt in your attendance. Being absent from your job or late in arriving creates a hardship on your department and your fellow employees who may have to cover for you.

"When you are unable to report for work or will be late in reporting for work, *you are responsible for notifying your supervisor or other designated persons as soon as possible, in keeping with department policies.* You must also keep your supervisor informed if your absence will continue, and when you can be expected to return to work.

---

1. Before trial, the plaintiff dismissed two of the three claims she asserted against Flower, those being claims of defamation and intentional infliction of emotional distress.

"Your failure to personally advise your supervisor when you can't report as assigned, for any reason, will mean that you lose eligibility for sick leave pay and don't build up vacation time while you are gone.

*"Unreported or unexcused absences or tardiness can result in disciplinary action up to and including termination. Excessive absences or tardiness will be reviewed by your supervisor and corrective measures begun."* (Emphasis added.)

3. The pharmacy promulgated management guidelines intended for use by supervisory personnel in implementing that department's policies. Approximately one year after beginning work at Flower, Waller gave the plaintiff a copy of the pharmacy's policy and procedure guidelines that addressed the department's *ordinary* tardiness guidelines. That document read as follows:

*"POLICY:*

"The Department of Pharmacy and hospital expects and needs [*sic* ] employees to be in their area of work at the start of their scheduled shift. Tardiness will be defined as clocking in at *any* time past the start of the scheduled shift. The payroll policy of not docking employees pay for clocking in up to a tenth of an hour past the start of the scheduled shift is unaffected by the Pharmacy department definition of tardiness.

*"PROCEDURE:*

"1. The Secretary, being checked by the Pharmacy Manager/Assistant Manager, will determine instances of tardiness from employee timecards on a biweekly basis.

"2. Instances of tardiness will be recorded on the Employee Calendars maintained in the pharmacy department.

"3. An employee will be allowed up to three instances of tardiness during a month. Tardiness greater than three incidents per month may result in progressive disciplinary action.

"4. *The progressive disciplinary action plan for a twelve (12) month period will be the following sequence: Counseling, Oral Reprimand, Written Reprimand, Suspension and Termination.*

"5. Occasions (e.g. bad weather) when it is not possible to get to work at the start of the scheduled shift will be taken into consideration." (Emphasis added.)

4. The hospital also promulgated guidelines for "corrective discipline" and "rules of conduct" in the hospitalwide policy and procedure manual at Sections 2:10–A and 2:10–B, respectively (collectively referred to as "Corrective Discipline"), to address *extraordinary and/or chronic violations* of departmental policies. In relevant part, Section 2:10–A reads as follows:

"When management/supervision must intervene in a situation in which the employee has failed to evidence self-discipline, CORRECTIVE DISCIPLINE is instituted to prevent the specific or similar behavior from occurring again.

" \* \* \*

"3.   The forms of corrective discipline, listed in ascending order of severity but not necessarily sequential or inclusive, are as follows:

"a.   *Reminder/Reprimand* \* \* \*

"b.   *Warning* \* \* \*

" \* \* \*

"6.   *If several problem(s)/infraction(s) occur which adversely affect job performance, organizational efficiency and/or the reputation of the organization, and the combination constitutes a more serious discipline problem than any one by itself, stronger action than the minimum prescribed for the last incident will be taken.   In a most serious case, multiple problem(s)/infraction(s) may result in involuntary termination of employment.* \* \* \*

"7.   Failure to make reasonable effort to respond to corrective discipline may result in involuntary termination [of] employment.   \* \* \*"   (Emphasis added.)

Section 2:10–B reads in pertinent part as follows:

"3.   Violations Subject to Immediate Discharge:

" \* \* \*

"q.   *CONTINUED FAILURE TO RESPOND TO CORRECTIVE DISCI-PLINE:*   Continued failure to change or improve after corrective discipline is taken.   Violations of these Rules of Conduct or problems occurring in multiples of two or more (either concurrently or over time), which in combination constitute an unacceptable work record or a discipline problem of such seriousness that discharge is required.

"All violations cannot be totally defined or listed.   Action taken must be based on the nature and severity of the offense, circumstances surrounding the violation, and the employee's prior record."

5.   Over the course of her employment, the plaintiff was disciplined for tardiness in the following manner on the following dates: counseling memorandum—April 2, 1986 (six instances of tardiness in March 1986);   counseling memorandum—August 20, 1986 (noting twenty-five instances of tardiness, which was five times the department average over the same time period);   counseling memorandum—October 2, 1986 (four instances since last discipline);   oral reprimand—December 11, 1986 (seven instances since the last discipline);   written reprimand—February 5, 1987 (four instances since last discipline);   warning—

November 3, 1988 (noting four instances since April 1988 annual evaluation [" * * * Failure to meet (a less-than-one-tardiness-per-quarter goal) will lead to discharge without further recourse to additional corrective discipline"] ); written note to file—April 10, 1990 (six instances since December 1989 [allegedly due to separation from spouse] ); reminder—November 6, 1990 (twenty-eight instances since January 1, 1990); reprimand—December 20, 1990 (four instances since last discipline); warning—February 14, 1991 (three instances since last discipline [more than one tardiness per quarter "will lead to discharge without further recourse to additional corrective discipline"] ); and termination—March 1, 1991 (two instances since last discipline).

6. In November 1988, the hospital implemented its Corrective Discipline procedures to address the plaintiff's excessive pattern of tardiness. In so doing, Flower substituted the Corrective Discipline procedures for the use of the pharmacy's normal tardiness policy as it related to the plaintiff. Flower then warned the plaintiff that immediate discharge might be imposed for tardinesses in excess of one per quarter based on her inability to remedy her chronic tardiness problem. At that time, Waller specifically told the plaintiff that any future situation concerning her tardiness or implicating a hospital policy on tardiness was to be brought to the attention of Waller or an assistant director of the pharmacy rather than her immediate supervisor.

7. On February 27 and 28, 1991, the plaintiff was late twenty-eight and twelve minutes, respectively, due to snowy weather conditions. She did inform her immediate supervisor of these instances (she phoned prior to arriving on February 27, and spoke in person after arriving on February 28). She did not bring these tardinesses to the attention Waller, the department director, or an assistant director.

8. On March 1, 1991, Flower terminated the plaintiff's employment without first resorting to suspension.

9. At no time prior to the plaintiff's discharge did Flower promise her permanent employment, that she would not be fired for her personal problems, that she could be discharged only for just cause, that Flower would not apply the Corrective Discipline policy and procedures to her, that Flower would apply the pharmacy department's tardiness guidelines to her or that she would not be fired if she followed them, or that she would be suspended before any termination.

## III. CONCLUSIONS OF LAW

1. The plaintiff accepted an oral offer of employment by Flower in April 1985, thus establishing an employment relationship. Flower subsequently made the same offer in writing, which the plaintiff accepted by her signature. The writing

was coextensive with the oral offer and acceptance (hereinafter jointly referred to as "the contract") and memorialized the employment relationship in the following relevant terms:

"It is a pleasure to appoint you as a full-time Pharmacy Technician II, effective April 15, 1985. Your rate of pay will be $6.47 per hour. Within your first 90 days of employment, your progress and performance will be evaluated by your supervisor and/or department head. Your hours of work upon employment will normally be 10:45 p.m. to 7:15 a.m."

2. The contract created an employment relationship terminable at will by Flower or the plaintiff because it failed to specify a certain term or duration of employment. *Henkel v. Educational Research Council of Am.* (1976), 45 Ohio St.2d 249, 74 O.O.2d 415, 344 N.E.2d 118, syllabus; *Mers v. Dispatch Printing Co.* (1985), 19 Ohio St.3d 100, 19 OBR 261, 483 N.E.2d 150, paragraph one of the syllabus. As such, the contract was terminable by either party, for any reason at any time, even if done in reckless disregard of the rights of the other. *Phung v. Waste Mgt., Inc.* (1986), 23 Ohio St.3d 100, 102, 23 OBR 260, 261–262, 491 N.E.2d 1114, 1116. Such a contract, however, may not be terminated for a reason that is contrary to law. *Mers*, 19 Ohio St.3d at 103, 19 OBR at 263–264, 483 N.E.2d at 153.[2] The record is devoid of any evidence of an illegal motive. Therefore, the hospital has breached no contractual duty to the plaintiff unless its conduct fell within an exception to the terminable-at-will doctrine.

3. Two relevant exceptions to the terminable-at-will doctrine are potentially applicable here to create enforceable employment rights by the plaintiff: modification of the employment arrangement and promissory estoppel. See *Mers*, 19 Ohio St.3d at 103–104, 19 OBR at 264, 483 N.E.2d at 154; *Bartlett v. Daniel Drake Hosp.* (1991), 75 Ohio App.3d 334, 338, 599 N.E.2d 403, 405–406.

4. Modification: The plaintiff asserts that the employment relationship was modified by the handbook and hospital policy and procedure manuals. Employee handbooks or company policy manuals discussing employer expectations and employee guidelines do not, in and of themselves, modify an employment relationship from one which is terminable at will into one terminable only for just cause, especially when the documents do not profess to create a "just cause" requirement for discharge. *Faykosh v. Jewish Community Ctr. of Toledo*

---

2. For example, an employer may not terminate an employee in retaliation for filing workers' compensation or discrimination (race/sex/age/disability) claims, or for engaging in union activity. *Id.* at 103, 19 OBR at 263–264, 483 N.E.2d at 153, fn. 2. Also, an employee may not be discharged in retaliation for reporting some varieties of illegal activities on the part of an employer. R.C. 4113.52; *Greeley v. Miami Valley Maintenance Contrs., Inc.* (1990), 49 Ohio St.3d 228, 551 N.E.2d 981, paragraphs one and two of the syllabus.

(Aug. 19, 1988), Lucas App. No. L–87–335, unreported, 1988 WL 86967. Employer handbooks and company policy manuals may modify an employment relationship that would otherwise be terminable at will. *Mers,* 19 Ohio St.3d at 104, 19 OBR at 264, 483 N.E.2d at 154. However, to do so the modification must be accompanied by "the paradigm elements essential to contract formation—*i.e.,* offer, acceptance, and consideration * * *." *Faykosh, supra,* citing *Helle v. Landmark, Inc.* (1984), 15 Ohio App.3d 1, 8, 15 OBR 22, 29, 472 N.E.2d 765, 773. Implicit in the offer/acceptance requirement is the additional element that the parties have a meeting of the minds. *Bartlett,* 75 Ohio App.3d at 338, 599 N.E.2d at 405–406. The court concludes that there has been no modification of the terminable-at-will employment relationship in this case.

a. No Offer or Meeting of the Minds: Initially, the court notes that the hospital discussed neither the contents of the handbook nor the provisions of the pharmacy department's policy and procedure manual (in which the pharmacy's tardiness policy was set forth) prior to the plaintiff's accepting employment at Flower or prior to her orientation session. The plaintiff acknowledges that the policies, including tardiness provisions, were changeable by Flower at any time without her consent. The court concludes that the tardiness policies were clearly intended for management guidelines rather than promises to her. The court also concludes that Flower made no promise that the plaintiff would not be fired if she complied with the tardiness guidelines, that Flower would always follow progressive discipline provisions in those guidelines, that she would have permanent employment, or that she would be discharged only for just cause. Therefore, because there were no such offers made, the court concludes that there has been no meeting of the minds on these issues. *Bartlett,* 75 Ohio App.3d at 338, 599 N.E.2d at 405–406; *Cohen & Co. v. Messina* (1985), 24 Ohio App.3d 22, 24, 24 OBR 44, 46, 492 N.E.2d 867, 870.

b. No Consideration: In this case Flower requested no additional legal detriment from the plaintiff as consideration for permanent employment; plaintiff was only required to perform her job. See *Faykosh, supra.* And the hospital made no promise that the tardiness policy would be followed and that the Corrective Discipline policy would not be followed. Additionally, the plaintiff was not injured by detrimentally relying on representations made by Flower. She entertained no job offers and, thus, turned down no job prior to her termination, and she made no agreement to stay employed by the hospital for a specific period. Accordingly, the court concludes that the plaintiff gave no additional consideration necessary to modify the terminable-at-will nature of her employment relationship.

5. Promissory Estoppel: Under the doctrine of promissory estoppel, specific promises of job security can create an exception to a terminable-at-will

employment relationship. *Helmick v. Cincinnati Word Processing, Inc.* (1989), 45 Ohio St.3d 131, 543 N.E.2d 1212, paragraph three of the syllabus. However, to transform an otherwise terminable-at-will relationship, the following elements must exist: (1) a promise containing clear and unambiguous terms, (2) reliance by the party to whom the promise was made, (3) the reliance must be reasonable and foreseeable, and (4) the relying party must have been injured due to her reliance. *Cohen*, 24 Ohio App.3d at 24, 24 OBR at 46, 492 N.E.2d at 870. Favorable reviews of job performance, as those generally received in this case by the plaintiff, are insufficient "promises." *Id.* Additionally, the mere fact that Flower elevated the plaintiff to "permanent" employee status, from probationary status, did not change the employment relationship into one terminable only for cause. See *Hudec v. Gordon Cooper Motor Sales, Inc.* (Dec. 7, 1990), Ottawa App. No. OT–89–21, unreported, 1990 WL 197936; *Boone v. Flower Mem. Hosp.* (Mar. 29, 1991), Lucas C.P. No. 90–1631, unreported. Her belief that termination would arise only upon just cause is also insufficient. *Faykosh, supra.* Similarly, Flower's statements that an employee could be fired for certain policy violations did not create a promise to or contract right in continued employment so long as the rules were followed. See *Pyle v. Ledex, Inc.* (1988), 49 Ohio App.3d 139, 145–146, 551 N.E.2d 205, 211–212.

a. Promise: Flower made no express promises to the plaintiff of permanent employment, termination only for just cause, or of the hospital's strict adherence to the pharmacy's tardiness policy and procedures.

b. Reliance: The record contains no evidence that the plaintiff relied to her detriment on any claimed representation by Flower. The plaintiff did not forgo any outside job prospects while employed by Flower, nor in any other way did she materially limit her job options. See *Helmick*, 45 Ohio St.3d at 136, 543 N.E.2d at 1217 (promises of job security trigger promissory estoppel). See, also, *Mers*, 19 Ohio St.3d at 104–105, 19 OBR at 264–265, 483 N.E.2d at 154–155. The plaintiff planned to stay at Flower permanently, although no permanent employment was promised her by the hospital. Such reliance is insufficient to trigger promissory estoppel. Only acts of reliance or forbearance that an employer should reasonably expect may sustain a promissory estoppel claim. *Mers*, 19 Ohio St.3d at 105, 19 OBR at 265, 483 N.E.2d at 155.

c. Conclusion: Thus, in the absence of evidence of a promise and reasonable detrimental reliance, the court concludes that the doctrine of promissory estoppel affords the plaintiff no relief in the case.

6. The hospital terminated the plaintiff for just cause. The plaintiff was aware that Flower had hospitalwide policies and procedures. Flower expressly invoked the Corrective Discipline provisions to attempt to remedy the plaintiff's

tardiness problems. Then, the hospital clearly briefed the plaintiff on its specific expectations regarding her chronic tardiness. Starting in November 1988, the hospital expected the plaintiff to contact the pharmacy director, Waller, or an assistant director upon the happening of any incident involving tardiness ("clocking in at *any* time past the start of the scheduled shift"). Although the plaintiff contacted her immediate supervisor on February 27 and 28, 1991 regarding her tardiness caused by bad weather, she failed to discuss these incidents directly with Waller or an assistant director as expressly required. Thus, these tardinesses were not excused and were sufficient and just cause for Flower to terminate her employment.

## JUDGMENT ENTRY

It is ORDERED that JUDGMENT is hereby entered in favor of the defendant and against the plaintiff on the plaintiff's complaint. It is further ORDERED that the plaintiff shall bear the costs of this action. The court finds no just reason for delay.

*Judgment for defendant.*