CHUBB

v.

OHIO BUREAU OF WORKERS' COMPENSATION.

Court of Claims of Ohio.

No. 97–01813.

Decided June 4, 1999.

■

*J. Michael Murray* and *Susan C. Margulies,* for plaintiff.

*Betty D. Montgomery,* Attorney General, and *Larry Y. Chan,* Assistant Attorney General, for the state.

### Decision on Liability

J. WARREN BETTIS, Judge.

Plaintiff, Kathryn A. Chubb, brought this action against defendant, the Ohio Bureau of Workers' Compensation, seeking damages for breach of contract. Defendant has denied liability. The case was tried to the court on the sole issue of defendant's liability.

Plaintiff is an attorney at law licensed to practice in the state of Ohio. In 1992, plaintiff was hired by defendant to work in its Cleveland office as an "Attorney 2," a classified civil service position.

In 1993, plaintiff was promoted by her immediate supervisor, Phillip Donner, to the position of "Attorney 3," commonly referred to as a lead attorney. As a lead attorney, plaintiff was charged with supervisory responsibilities for other attorneys in the Cleveland district.

In March 1994, plaintiff was offered a position with the Industrial Commission of Ohio at a substantially higher salary than she was making as an Attorney 3 with defendant. When plaintiff informed Donner of her offer, Donner expressed his desire to keep plaintiff in defendant's employ and asked what he could do to convince plaintiff to stay. Plaintiff informed Donner that she would stay with defendant if he could match the salary that she had been offered. As an Attorney 3, plaintiff was making $32,000 per year.

Thereafter, Donner made arrangements to "borrow" an administrative staff position from another department. The administrative staff position was in the unclassified civil service and paid a salary of $45,000 per year. In order for plaintiff to accept this position, however, she was required to execute a document

acknowledging her status in the unclassified civil service. Plaintiff executed such a document on July 23, 1994. Although plaintiff's title and compensation changed after July 23, 1994, her duties remained the same and she continued to report to Donner.

On or about the time that plaintiff was appointed to the administrative staff position, she began having problems with two other attorneys in the Cleveland office, Sally Walters and Kent Cicerchi. These attorneys made allegations regarding misconduct by plaintiff that eventually led to an internal investigation. On October 4, 1994, N. Eugene Brundige, defendant's chief of human resources officer, sent a letter to plaintiff that states:

"Please be advised that your [sic] are being considered for removal from your current unclassified position. This proposed action is requested for the following reasons:

"You are being charged with violation of BWC disciplinary guidelines 'Violation of the Ohio Revised Code Section 124.34.'

"Specifically, management has information that identifies that you have destroyed state documents by tearing up valid request for leaves from your subordinates; used BWC personnel to perform private business by having the word processor complete your personal work assignments which relate directly to your private interests and conducted private business on state time with state equipment. In addition it has been documented that you have performed personal business while on state time."

Thereafter, plaintiff and her attorney, William Doyle, met with representatives of defendant and negotiated an agreement whereby plaintiff agreed to serve a twenty-day suspension without pay in return for defendant's promise not to pursue any further disciplinary action against plaintiff for the alleged violations. The agreement was executed by plaintiff and William Pfeiffer, defendant's chief legal officer. Defendant also agreed to close its criminal investigation of plaintiff. Both parties agreed not to discuss the matter further.

Plaintiff served her twenty-day suspension and returned to work on January 23, 1995. On February 16, 1995, plaintiff received a written notice from Pfeiffer, who had been appointed defendant's acting administrator, advising plaintiff that her employment with defendant was terminated effective that day. Plaintiff packed her personal belongings and was escorted from the building later that day. Subsequently, criminal charges were brought against plaintiff for the alleged violations of R.C. 124.34. Ultimately, plaintiff was acquitted of the charges.

Plaintiff brought this action against defendant for breach of contract, alleging that her termination by defendant violated the employment agreement between

the parties. Defendant argues, however, that, as an unclassified civil servant, plaintiff served at the pleasure of the administrator and could be terminated for any reason at any time.

Generally, a classified employee in the civil service can be removed only for good cause and only after the procedures set forth in R.C. 124.34 have been followed. *Yarosh v. Becane* (1980), 63 Ohio St.2d 5, 9, 17 O.O.3d 3, 6, 406 N.E.2d 1355, 1359. An unclassified employee, on the other hand, is an "at-will" employee who is subject to discharge for any reason. *Lawrence v. Edwin Shaw Hosp.* (1988), 57 Ohio App.3d 93, 94, 566 N.E.2d 1256, 1258. However, an employment at-will relationship may be altered by express or implied contract. *Mers v. Dispatch Printing Co.* (1985), 19 Ohio St.3d 100, 103, 19 OBR 261, 264, 483 N.E.2d 150, 154. It is the employee's responsibility to produce evidence of contractual intent on the part of both parties to show that the at-will employment relationship has been modified. *Ekunsumi v. Cincinnati Restoration, Inc.* (1997), 120 Ohio App.3d 557, 562, 698 N.E.2d 503, 506; *DeKoning v. Flower Mem. Hosp.* (1996), 82 Ohio Misc.2d 20, 676 N.E.2d 614.

Based on the language of the parties' agreement of December 7, 1994, and the testimony in the record, it is clear to the court that the parties intended to modify the at-will employment relationship with regard to termination. Defendant agreed not to further discipline plaintiff for the violations alleged in the October 4, 1994 notice. Thus, the court finds that the at-will employment relationship between plaintiff and defendant was expressly modified by the written agreement.

Plaintiff has established that she upheld her part of the bargain by serving her suspension. In order to recover from defendant, however, plaintiff must prove by the greater weight of the evidence that defendant breached the agreement by terminating her for the same violations alleged in the October 4, 1994 letter.

To establish a breach of contract, plaintiff called her former supervisor to testify on her behalf. Donner insisted that after plaintiff returned from her suspension, the quality of her work was excellent, as it had been prior to the suspension. Donner could not think of anything plaintiff had done or not done at the work place in the three-week period after her suspension that could have justified the actions taken by the acting administrator.

Plaintiff testified that after she returned from her suspension, she performed the same duties that she had performed prior to the suspension, with the exception that she no longer supervised attorneys Walters and Cicerchi. Plaintiff stated that she was moved to defendant's Rockside Road office to avoid contact with Walters and Cicerchi.

Pfeiffer was called by plaintiff as on cross-examination. Pfeiffer admitted that, in discussions with Brundige prior to plaintiff's suspension, he recommended that plaintiff be terminated rather than suspended. He also admitted that he had not spoken with or met with plaintiff at any time after she returned from her suspension. With regard to the reason for plaintiff's termination, Pfeiffer stated that plaintiff's mere presence as lead attorney in the Cleveland district caused such turmoil in the office that her termination was justified. Pfeiffer could not cite any specific instance of misconduct by plaintiff after she returned from her suspension. Pfeiffer also testified that three days prior to plaintiff's termination, he was interviewed by a reporter from a local newspaper who was preparing a story about the recent events in defendant's Cleveland district. During that interview, Pfeiffer became aware that the article would be critical of defendant's handling of the investigation and discipline of plaintiff.

Based on the evidence admitted in this case, the court is convinced that plaintiff was terminated as a result of the same conduct that led to her twenty-day suspension. Based on this finding, the court concludes that defendant breached plaintiff's employment contract as modified by the December 7, 1994 agreement. Therefore, defendant is liable to plaintiff for breach of contract and shall pay damages to plaintiff in a sum to be determined at second trial on the issue of damages.

## Judgment Entry on Liability

On March 26, 1999, the court conducted a trial on the sole issue of defendant's liability. Based upon the totality of the evidence, the arguments of the parties, and for the reasons set forth in the decision filed herewith, it is ordered that judgment is rendered in favor of plaintiff in an amount to be determined in a second trial on the issue of damages.

*Judgment for plaintiff.*

J. WARREN BETTIS, J., retired, of the Columbiana County Court of Common Pleas, sitting by assignment.

## Decision on Damages

## Decided—October 20, 2000

J. WARREN BETTIS, Judge.

This case was tried to the court on the sole issue of plaintiff's damages. Defendant's liability has been determined in a previous decision of this court, wherein the court stated:

"Based on the evidence admitted in this case, the court is convinced that plaintiff was terminated as a result of the same conduct that lead to her twenty-day suspension. Based on this finding, the court concludes that defendant breached plaintiff's employment contract as modified by the December 7, 1994 agreement."

As of the time of plaintiff's termination in February 1995, she was a forty-six-and-one-half-year-old attorney who had been employed by defendant since April 6, 1992. Plaintiff's employment with defendant was her first and only legal employment since her admission to the bar in 1991. After her wrongful termination from defendant, plaintiff began to search for other legal employment in the field of workers' compensation, her chosen specialty. During this time period, plaintiff collected unemployment compensation, deferred her student loans, and borrowed money from her mother. Plaintiff also received a lump-sum payment from defendant for accrued vacation and sick time.

In July 1998, plaintiff began an "of counsel" relationship with the law firm of Garvin and Hickey ("G&H"). Plaintiff's responsibilities with G&H were to attend Industrial Commission hearings on behalf of G&H clients. As of the date of trial, plaintiff was compensated by G&H at a rate of $70 per hour, plus thirty-two cents per mile for travel expenses. Plaintiff is not considered "an employee" of G&H nor does she receive any employee benefits from G&H. Plaintiff also operates a children's aerobic business that she started after law school. According to plaintiff, this business does not make a profit.

### Past Lost Wages

Plaintiff seeks damages from defendant in the form of salary and benefits that she would have earned in her former position had she worked until retirement age, less what plaintiff has made and will make from other legal employment during that period. Defendant argues that plaintiff is not entitled to any award of back pay because she failed to exercise due diligence in seeking other suitable employment.

In *State ex rel. Martin v. Columbus Dept. of Health* (1979), 58 Ohio St.2d 261, 12 O.O.3d 268, 389 N.E.2d 1123, the Supreme Court held at paragraphs two and three of the syllabus:

"2. A public employee, even though he holds his position under civil service, who is wrongfully excluded from his position and sues to recover compensation for the period of exclusion, is subject to have his claim reduced by the amount he earned or, in the exercise of due diligence, could have earned in appropriate employment during the period of exclusion. (*State ex rel. Wilcox v. Woldman* [1952], 157 Ohio St. 264 [47 O.O. 164, 105 N.E.2d 44], approved and followed.)

"3. The principle of mitigation of damages applicable in a suit to recover compensation for a period of wrongful exclusion from employment is an affirmative defense and the burden of proof on that issue resides upon the employer responsible for the wrongful discharge."

Plaintiff testified that she took immediate steps to find other legal work in the field of workers' compensation after she was terminated by defendant. Plaintiff sent at least thirty cover letters and resumés to law firms with workers' compensation practices, but received no invitations to interview. Plaintiff also responded to positions advertised in legal publications, with no success. During her job search, plaintiff began working out of her home in what she referred to as "out-sourcing."

The court also notes that until January 1998, plaintiff was the subject of pending criminal proceedings related to allegations that she had improperly used her employer's time and equipment to perform private employment. Although plaintiff's cause of action in this case does not directly involve these criminal proceedings, plaintiff's wrongful termination by defendant did force plaintiff to involuntarily enter the job market at a time when her employability was severely hampered. According to plaintiff, a representative from a prominent law firm at which plaintiff sought employment told her that the firm could not hire her because of the pending criminal charges. Even Preston Garvin (her current employer) admitted that he was reluctant to hire plaintiff given her legal problems and that he hired her only after making inquiries about her reputation in the legal community.

Plaintiff did admit that she has not looked for other legal employment since she was hired at G&H and that she had previously sought legal employment only in the field of workers' compensation. Defendant argues that plaintiff failed to mitigate her damages by not seeking legal employment in the general practice of law rather than concentrating only on her specialty. However, under *Martin*, it is defendant's burden to present evidence that other suitable employment was available to plaintiff during the period of discharge. *Id.*, 58 Ohio St.2d at 265, 12 O.O.3d at 270, 389 N.E.2d at 1125. Defendant did not produce any evidence that legal employment in the general practice of law was available to plaintiff during the period following her discharge. Similarly, defendant did not produce any evidence to support its assertion that plaintiff could have simply "hung up her shingle" and begun a profitable business as a sole practitioner in the general practice of law. The court will not assume that an attorney out of law school for six years who has practiced only in the specialized field of workers' compensation can open a business in the general practice of law and become instantly successful. Defendant has the burden of establishing the likelihood of such a scenario. Defendant has not met that burden.

In short, the court finds that plaintiff has mitigated her damages in this case. Thus, plaintiff's damages are measured by the wages and benefits plaintiff would have earned had she not been wrongfully discharged by defendant, less the wages plaintiff actually earned in other similar employment during the period of discharge. *Martin, supra.*

Defendant's own director of payroll and benefits, Beth Poe, testified that plaintiff would have earned $201,657 in wages had she continued her employment with defendant through the date of trial. According to Poe, a twenty-eight percent increase in that figure is needed to account for the value of the benefits plaintiff would have received during that same period. Poe later amended this figure to $253,182 to account for a mathematical error.

Utilizing the same payroll information available to Poe, plaintiff's expert economist, Harvey Rosen, determined that plaintiff would have earned $269,289 in salary through the date of trial. Although Rosen agreed with Poe that the cost of plaintiff's employee benefits is equal to twenty-eight percent of plaintiff's salary, he stated that an additional 13.3 percent upward adjustment must also be made to account for defendant's contributions to plaintiff's Public Employees Retirement System ("PERS") account. According to Rosen, these contributions amount to an additional $111,243 through the date of trial. The court finds that Rosen's testimony is more credible with regard to the calculation of plaintiff's past wages and benefits. Based on Rosen's testimony, the court finds that plaintiff's past lost wages and benefits through the date of trial are $380,532.

With regard to the setoff of plaintiff's actual earnings during the period following the discharge, defendant argues that plaintiff's gross earnings as a sole practitioner should be set off against her gross earnings as an employee of defendant. Plaintiff argues that only her "net receipts" of $81,462 should be considered for purposes of setoff.

Defendant's argument ignores the fact that plaintiff, as a sole practitioner, must incur considerable uncompensated expenses in producing gross revenue and that those expenses are deductible from gross revenue in determining plaintiff's net receipts. Plaintiff did not incur the same type of expenses as an employee of defendant. Therefore, the court finds that plaintiff's net receipts are the appropriate amount to set off from the wages and benefits plaintiff would have earned had she remained employed by defendant. Deducting plaintiff's net receipts during the period following the discharge from the wages and benefits plaintiff would have earned had she remained employed by defendant through the date of trial yields a figure of $299,070 in past lost wages.

The court further finds that a deduction from plaintiff's award of past lost wages is necessary to account for the $5,965 plaintiff received in unemployment compensation during the first six months after her discharge. Deducting $5,965

from plaintiff's proven lost wages of $299,070 results in a $293,105 award of past lost wages.

## Future Lost Wages

■ With regard to future wages, plaintiff's claim is premised upon two basic assumptions: (1) that she would have continued working for defendant in the same position, with appropriate pay increases until the age of retirement and (2) that plaintiff will continue working in an "of counsel" relationship with P&G at a rate of pay equal to the four-year weighted average of her past earnings.

Plaintiff has the burden in this case of proving the existence and amount of future damages with a reasonable degree of certainty. Cf. *Charles R. Combs Trucking, Inc. v. Internatl. Harvester Co.*, (1984), 12 Ohio St.3d 241, 12 OBR 322, 466 N.E.2d 883. In the view of the court, plaintiff has failed to meet that burden. Although plaintiff testified that she wanted to stay in defendant's employ until retirement, plaintiff admitted that she was ready to leave employment with defendant for a higher paying position in 1994. Similarly, plaintiff has not convinced the court that her current "of counsel" relationship with G&H will be her last or best legal position. The court finds that plaintiff retains some opportunity to seek and obtain more lucrative, fulltime employment in the future. The negative impact of the criminal charges will surely abate over time. Moreover, the four-year weighted average used to calculate plaintiff's income underestimates plaintiff's earning potential, since plaintiff earned very little in the first two years after her discharge from employment with defendant.

In short, plaintiff has failed to establish future wage loss with the required degree of certainty, and the court will make no award to plaintiff for future lost wages.

## Prejudgment Interest

■ Plaintiff claims that she is entitled to prejudgment interest on her award of past lost wages under the rule of law set forth in *Royal Elec. Constr. Corp. v. Ohio State Univ.* (1995), 73 Ohio St.3d 110, 652 N.E.2d 687. However, the court finds that the *Royal Electric* case is distinguishable since the total award to plaintiff in that case could easily be fixed in time, by the date of "substantial completion" of the work. In this case, plaintiff's award continued to grow on a daily basis up to the day of trial. Thus, the *Royal Electric* case does not support an award of prejudgment interest under the facts of this case. Moreover, plaintiff did not provide the court with any evidence of an acceptable method to calculate prejudgment interest under these facts. In short, the court will not award prejudgment interest to plaintiff.

Judgment Entry

This case was tried to the court on the issue of plaintiff's damages. The court has considered the evidence and rendered its decision filed concurrently herewith. Judgment is rendered in favor of plaintiff in the amount of $293,130, which includes the $25 filing fee paid by plaintiff. Court costs are assessed against defendant. The clerk shall serve upon all parties notice of this judgment and its date of entry upon the journal.

*Judgment accordingly.*

Journal Entry Approving Settlement

Filed—July 30, 2001

The court, being fully advised as to the premises, approves and confirms the settlement agreement heretofore entered into by and between the parties hereto and orders the cause be dismissed with prejudice to all parties. All court costs to be paid by the defendant. No interest shall be paid on the amount of the settlement.

It is further ordered that the settlement warrant of $293,130 be drawn on the account of the Ohio Bureau of Workers' Compensation and be sent to the plaintiff.