DECISION AND JUDGMENT ENTRY
{¶ 1} On November 7, 2000, appellant, Nicholas A. Sagonowsky, filed suit against The Andersons, Inc. ("Andersons"), Michael Anderson, Joseph Christen, Rasesh Shah, James Roby, Leonard Mahlman, and Bernard Wise. Appellant was hired by Andersons as an Engineering Manager on September 16, 1996. Appellant's employment with Andersons was terminated on June 30, 2000. Appellant alleged that his termination was wrongful and brought the present action against appellees, alleging breach of employment contract, promissory estoppel, lack of good faith and fair dealing, violations of public policy, defamation, defamation per se, interference with an employment contract, conspiracy, intentional infliction of emotional distress, and fraud.
 {¶ 2} The trial court granted a motion for partial summary judgment on behalf of Andersons and Shah, on February 28, 2002, regarding appellant's first and second claims for relief, breach of employment contract and promissory estoppel, and denied appellant's cross-motion for summary judgment regarding those claims. On November 20, 2002, the trial court also granted, in part, appellees' second motion for partial summary judgment. The trial court granted summary judgment with respect to all remaining claims, except for appellant's claims of violation of public policy, regarding termination in retaliation for his discussions with counsel, and defamation per se concerning oral and written statements made by appellees about appellant in connection with a company initiated survey. As such, only appellant's claims regarding violation of public policy, defamation per se, and punitive damages remained for trial.
 {¶ 3} The trial began on May 19, 2003. At the conclusion of appellant's case, the trial court granted a directed verdict with respect to appellant's claim of violation of public policy and on the defamation claims against Andersons, Michael Anderson, and Wise. The issue of defamation per se with respect to Roby, however, went to the jury. The jury ultimately found in favor of appellee Roby. Appellant appeals the decisions of the trial court granting summary judgment and a directed verdict, and raises the following assignments of error:
 {¶ 4} "First Assignment of Error: The trial court erred in granting Defendants' Motion for Partial Summary judgment. February 28, 2000 Opinion.
 {¶ 5} "Second Assignment of Error: The trial court erred in granting a judgment as a matter of law at the conclusion of plaintiff's case. Trial transcript page 1152.
 {¶ 6} "Third Assignment of Error: The trial court in refusing to allow plaintiff to cross-examine defendant Christen on the basis of a prior inconsistent statement made under oath before the Ohio Unemployment Review Commission. Trial Transcript page 803.
 {¶ 7} "Fourth Assignment of Error: The trial court erred in granting summary judgment against plaintiff on Count 11 (Fraud), Opinion of November 20, 2002, page 48 et seq."
 {¶ 8} Assignment of Error Number One
 {¶ 9} Appellant argues in his first assignment of error that the trial court erred in granting Andersons' motion for partial summary judgment, on February 28, 2000, with respect to appellant's claims of breach of employment contract and promissory estoppel. In particular, appellant argues that Andersons created an exception to the employment atwill doctrine by creating an employment contract, through numerous publications, such as the Statement of Principles ("principles"), the Employee Handbook/Manual ("handbook"), the Discipline and Separation General Policy ("disciplinary policy"), and enforceable oral promises. Appellant asserts that Andersons was prohibited from violating this express and implied contract of employment and that Andersons' promises were enforceable pursuant to the doctrine of promissory estoppel.
 {¶ 10} In its February 28, 2002 decision, the trial court held that the qualified, rather than absolute, aspirational statements in the handbook and principles were not sufficient to create a question of material fact regarding whether there was an implied contract of employment that provided an alternative to the at-will agreement. The trial court also held that the disciplinary policy did not constitute evidence of an implied contract of employment that provided an alternative to the at-will agreement because it was subject to change by management at any time, was not mandatory, but was merely a "guideline," and specifically stated that "[d]epending on the seriousness of the offense, any or all of the steps preliminary to discharge may be skipped." With respect to the oral representations made by Shah and Bethel, the trial court held that their statements "fall short of evidence that raises questions of material fact regarding the terms of an alleged implied contract of employment for plaintiff." Finally, the trial court held that "even if anything defendants initially did or said could reasonably have been understood to guarantee Plaintiff future employment, Plaintiff clearly had indications that Anderson was dissatisfied with his interpersonal communication and leadership skills, which negates any claim that he continued to believe he was promised job security."
 {¶ 11} With respect to appellant's claim of promissory estoppel, the trial court held that the alleged statements by Shah and Bethel regarding job security did not rise to the level of clear and unambiguous promises to appellant of job security. Moreover, the trial court found that appellant did not detrimentally rely on appellees' alleged promises because appellant was aware that Andersons perceived that he had performance problems by April 2000 and, therefore, began a job search for employment outside of Andersons.
 {¶ 12} We note at the outset that, in reviewing a motion for summary judgment, we must apply the same standard as the trial court. LorainNatl. Bank v. Saratoga Apts. (1989), 61 Ohio App.3d 127, 129. Summary judgment will be granted when there remains no genuine issue of material fact and, when construing the evidence most strongly in favor of the non-moving party, reasonable minds can only conclude that the moving party is entitled to judgment as a matter of law. Civ. R. 56(C).
 {¶ 13} In the absence of a contract which provides for a specific duration of employment, an employee is presumed to be employed at will, terminable at any time with or without cause. Phung v. Waste Mgt., Inc.
(1986), 23 Ohio St.3d 100; and Henkel v. Educational Research Council
(1976), 45 Ohio St.2d 249, 254-255. There is "a strong presumption in favor of a contract terminable at will unless the terms of the contract or other circumstances clearly manifest the parties' intent to bind each other." Henkel at 255, citing Forrer v. Sears, Roebuck Co. (1967),36 Wis.2d 388, 393. There are recognized exceptions to the employment-at-will doctrine, including violation of public policy, express or implied contract, and promissory estoppel. Mers v. DispatchPrinting (1985), 19 Ohio St.3d 100, 103.
 {¶ 14} The Ohio Supreme Court in Mers, noted that "[e]mployee handbooks, company policy, and oral representations have been recognized in some situations as comprising components or evidence of the employment contract." Mers at 104, citing Hedrick v. Ctr. for ComprehensiveAlcoholism Treatment (1982), 7 Ohio App.3d 211; and Helle v. Landmark,Inc. (1984), 15 Ohio App.3d 1. There is, however, a heavy burden on the party relying on an implied contract to "demonstrate the existence of each element necessary to the formation of a contract including, inter alia, the exchange of bilateral promises, consideration and mutual assent."Bowes v. Toledo Collision — Toledo Mechanical, Inc. (Aug. 18, 2000), 6th Dist. No. L-00-1017, citing Gargasz v. Nordson Corp. (1990),68 Ohio App.3d 149, 154; and Penwell v. Amherst Hosp. (1992),84 Ohio App.3d 16, 21. "Generally, where the employee furnishes no consideration other than his or her services incident to the employment, the relationship amounts to an indefinite general hiring terminable at the will of either party unless the terms of the contract or other circumstances clearly manifest the parties' intent to bind each other."Pyle v. Ledex, Inc. (1988), 49 Ohio App. 3d 139, 141, citing Mers,
supra.
 {¶ 15} Other courts also have held that the terms of an employee handbook, company policy, and oral representations "do not create employee rights which alter the `termination for any reason' terms for discharge under the at-will situation unless the parties have a `meeting of the minds' indicating that such items are to be considered valid contracts altering the terms for discharge." Bartlett v. Daniel DrakeMemorial Hospital (1991), 75 Ohio App.3d 334, 338, citing Turner v.SPS Technologies, Inc. (June 4, 1987), 8th Dist. No. 51945. See also,Balbach v. Akron Metro. Hous. Auth. (1987), 9th Dist. No. 12292. These courts consider that without a meeting of the minds, personnel manuals and the like "merely constitute unilateral statements of company rules and regulations." Id. Whereas, the Second Appellate District has held that merely the "employee's faithful discharge of duties is the consideration flowing to the employer in exchange for the employer's unilateral promise to comply with its policies." Bidwell v. TheChildren's Med. Ctr. (Nov. 26, 1997), 2d Dist. No. 16402.
 {¶ 16} In this case, the pertinent undisputed facts are as follows. Prior to being hired by Andersons, appellant was an Engineering Specialist with BP Oil in Lima, Ohio. Upon learning the Lima refinery was going to be sold, appellant began a job search and responded to an internet posting for the Engineering Manager's position at Andersons. Appellant was interviewed by Bob Bethel, Andersons Employment Manager, and Rasesh Shah, Director of Engineering and Maintenance and the direct supervisor of the Engineering Manager. Appellant was informed that a study of the Engineering Department had been done by the consulting firm IET. IET's report contained a number of recommendations, some of which would be a priority for the new Engineering Manager to implement.
 {¶ 17} Eventually, appellant was hired by Andersons on September 16, 1996 as Engineering Manager. In this position, appellant was supervisor over approximately 30 individuals, including appellees Roby, Mahlman, and Wise, who had been project engineers with Andersons for a number of years prior to appellant being hired.
 {¶ 18} Relevant to this appeal is the nature of appellant's employment status, which appellant claims is more than just an at-will employee. During appellant's interview process, Bethel gave appellant a copy of Andersons' principles, which includes the company's mission statement, so that appellant could understand the "culture of the company." In particular to this case, the principles stated:
 {¶ 19} "Our Statement of Principles expresses beliefs and philosophy, held by the founding partners of Andersons, forming the basis for the development of operating principles and the Company's Mission, which follow. What is written here represents a commitment of the Board of Directors and serves as a guide for all members of the organization. * * *
 {¶ 20} "We believe in the dignity of honest work and that working toward Company goals should provide support and opportunity for each member of the organization to establish and progress toward personal goals. Opportunity for employment and advancement should be available to all qualified candidates * * *.
 {¶ 21} "* * * We strive for leadership which not only cares, but listens. We emphasize face-to-face communication and our Open Door Policy provides an opportunity for any member of the organization to sincerely and constructively seek a solution to a job-related problem without necessarily following the usual chain of authority.
 {¶ 22} "We believe that permanent employment status with Andersons represents a serious commitment by the Company, and that every reasonable effort should be made to provide continued employment for permanent members of the organization as long as they are willing and able to fulfill their responsibilities. Even though circumstances can arise under which continued employment might require the acceptance of alternate work at a reduced rate of pay, or under which it might be impractical or even impossible, job security remains a cornerstone of our relationship with our permanent employees. * * *
 {¶ 23} "While the Company pledges its best efforts toward providing secure employment and personal growth opportunities, each employee needs to accept ultimate responsibility for his or her own future. No company can honestly guarantee lifetime security to anyone. Our greatest security lies in our own ability and our willingness to exert the effort needed to succeed.
 {¶ 24} "* * * We believe that good job performance should be rewarded in both wage and opportunity for advancement. Conversely, if acceptable performance is not achieved, appropriate action to correct deficiencies is in order. * * *"
 {¶ 25} Bethel discussed with appellant the company's mission statement and principles as quoted above. Bethel remarked about the longevity of people in their jobs, which appellant took to mean that "it just seemed like people went to their graves in their jobs." Appellant stated the following in his deposition regarding Bethel's comments:
 {¶ 26} "[Bethel] almost — he almost kind of laughed at the job security thing. He almost said it was a detriment to the performance of the company that — even though I didn't view it that way, but his take was that there's so much stagnation and — he — I'm paraphrasing what his frame of mind was, but that there's so much longevity and stagnation that there — it's an impediment to freshness, creativity, general achievement and performance in the organization. * * * I was struck by the concept of longevity. That just — it floored me when I hear about people —."
 {¶ 27} Shah also discussed with appellant the corporate culture of "permanent" employment with Andersons. According to appellant, Shah stated that "you won't get rich at The Andersons, but you'll always have a job." Appellant stated that he found the concept of longevity to be a favorable attribute.
 {¶ 28} The language of the principles was echoed in the handbook, which appellant received shortly after being hired. Regarding the employment relationship, section 1.02, "Employment Status," of the handbook stated:
 {¶ 29} "The Andersons believe that the permanent status represents a serious mutual commitment between you and the company. As long as you are willing and able to fulfill your responsibilities to the company by satisfactory job performance, the company recognizes its obligation to make every reasonable effort to provide continued employment although it may not always be possible to provide a job of equal pay. Layoff or termination of permanent personnel because of business slowdown or lack of work is not acceptable to Andersons and will not be considered unless there is no reasonable or practical alternative, consistent with our Statement of Principles."[1]
 {¶ 30} Appellant set about to implement procedural changes in the engineering department in accordance with the IET report. According to Shah, however, in 1997 or 1998, he began to hear negative comments about appellant from the engineers in his department. Shah advised appellant to have a team building session with his department to surface the issues. Shah stated in his deposition that appellant was resistant to the idea of a team building. At appellant's January 27, 1999 performance review, Shah told appellant that he felt a departmental survey was in order to get some sense of morale. Shah listed "Organizational Survey and/or Limited Team Building" as one of appellant's goals for the next six month period.
 {¶ 31} Appellant initiated the process of developing a survey with Joseph Christen, Vice President of Human Resources. A survey of the engineering department regarding appellant's performance was taken on or about June 10, 1999. Generally, the survey indicated that individuals in the engineering department felt that appellant failed to meet expectations in the categories of adaptability, analytic abilities, decision making, delegation, innovativeness, leadership, marketing, operations, planning, sales, supervision, strategic planning, team player, and technical knowledge.
 {¶ 32} A feedback session was held on September 21, 1999 to discuss the results of the survey and identify areas where appellant needed to improve. Included in the meeting were appellant, the three appellee engineers, Shah, and Christen. Christen stated that he came away from the session believing that appellant was "competent in his position technically," but that appellant "had some serious areas of concern, principally in the area of decision making, communication, adaptability, [and] leadership that needed to be addressed."
 {¶ 33} As a result of the September 1999 meeting results, pursuant to Christen's suggestion, appellant prepared an action plan to address the issues raised in the survey and feedback session. In his action plan, appellant pledged to "be sensitive to overuse of email in lieu of personal or group communication"; not "over analyze smaller issues" with respect to decision making and make "more rapid decision[s]" on projects; not second guess or re-evaluate matters after delegating them to others; and "work on better planning and earlier start to projects." Following the September meeting, Christen was under the impression that appellant was implementing his action plan. In early March 2000, however, Christen was contacted by Wise and informed that not only had things not improved in the department, but that they were worse.
 {¶ 34} In March 2000, Christen talked with Mahlman and Roby about appellant's performance since the September 1999 meeting. Christen testified that appellant was still experiencing serious problems with communication, over analysis, decision making, and second guessing the work and decisions of the engineers in his department. Roby, in particular, informed Christen that appellant demonstrated insensitivity and a lack of appropriate management and leadership skills. Christen testified that he told appellant that although appellant's attempts to implement change in the department were probably admirable, the manner in which he was trying to effectuate change was not successful. As such, Christen discussed leadership and management styles with appellant.
 {¶ 35} Christen testified that he and Shah offered to coach appellant to help him be more effective in dealing with implementing the changes required and minimize resistance. Christen stated that appellant did not "think that the problems were that serious, and he didn't really accept the fact that it was his need to change." Because of the divergent views between the appellee engineers and appellant, Christen scheduled a "family group confrontation meeting" for March 29, 2000. Christen stated that his goal in having the meeting was "to provide [appellant] direct feedback from the project engineers with the assistance of [Shah] to coach him in how his methods of leadership and management were being perceived and indeed being perceived as ineffective."
 {¶ 36} The engineers voiced their concerns regarding appellant's ability to manage the department. Appellant testified that he rejected the allegations as being false or exaggerated. Christen testified that it came up during the meeting that "we had to see some change because it was not going well, and that it was important that [Shah] in this particular case review the functioning and efficiency of the engineering department, and ultimately there would have to be a decision made as far as a change in behavior or a change in personnel, that being either the team or the coach."
 {¶ 37} A second meeting was held on April 6, 2000, with the same persons present. Roby indicated that he did not believe the situation could be rectified. Wise and Mahlman thought that the chances for a successful resolution were low, particularly because, during the cooling off period between the first and second meetings, appellant focused only on problems with the department and not with himself. Appellant had stated at the meeting that he recognized there were areas where he could improve, but that the entire department needed to "take on the challenges and elevate its standards." Appellant felt that the negative comments from the appellee engineers were even worse during the April 6 meeting then they had been during the March 29, 2000 meeting.
 {¶ 38} Christen was also concerned that the situation with appellant might not be salvageable primarily because of appellant's "attitude toward the need for change on his part." Following the April 6th meeting, Christen stated that he met with appellant "to say that change had to occur, his style was ineffective and that [he'd] be willing to work with him, because at that point in time [he] thought [appellant], indeed, was in jeopardy because of his performance and lack of followership from the department." Christen discussed with appellant the fact that if the situation could not be resolved, the company would be willing to look at other alternatives to use his technical qualifications, such as having him become a project engineer. Christen indicated, however, that appellant was not very receptive to that idea. Appellant denied that such a conversation took place about becoming a project engineer, but was well aware that his job was in jeopardy.
 {¶ 39} According to Christen, after the April 6 meeting, they were in "a performance improvement planning process" with appellant, which was a period during which an employee is given on opportunity to do certain things pursuant to an action plan to improve. Christen testified that appellant indicated he had not completed the action plan from September 1999 as well as he could have and, at that point, Christen talked to appellant again about a performance improvement plan and told appellant that he needed "to do these things to be effective in [his] job."
 {¶ 40} On April 10, 2000, Christen again met with and talked to appellant "about the severity of the situation that, indeed, there was a need for a change, and that if [appellant] was not able to make the change or accept another position in the organization, [Andersons] wouldn't have any alternative but to terminate, but the choice was his to change his behavior and provide the leadership required in the position." Appellant stated in his deposition that Christen told him at the April 10 meeting that, in order to keep his job, he would have to admit fault and formulate an action plan. No new written action plan was formulated or implemented.
 {¶ 41} On April 28, 2000, Christen testified that he met with appellant. According to Christen, appellant told him that he was not sure he wanted to step down and that he still believed that things were not that bad. Christen responded to appellant as follows: "I reminded him that we had been through surveys, meetings, interviews with employees in the department and that, indeed, things were that serious, and until there's a change in his management or leadership — again, that need for his change, he would have that option consistent with company policy to step down, and that short of a project engineer position there aren't many technical-type positions in the company, which would leave him very few, if any, alternatives at that time and he may want to consider his future employment, as well as his ability and interest in changing his leadership style * * *." Christen stated that appellant again reiterated the fact that he did not think it was that serious, and that "he thought the problem was not his problem, it was the problem of the department."
 {¶ 42} Between April 6 and May 8, 2000, appellant conducted a job search by contacting a headhunter and posting his resume on the Internet. Appellant was offered a position in late May 2000 by a company in Adrian, Michigan. The salary offered was only 90 percent of appellant's current salary at Andersons and appellant informed the company that he was pursing other opportunities.
 {¶ 43} On or about May 8, 2000, Shah called appellant to set up a meeting regarding his job status and employment situation. Appellant informed him that his attorney had sent a letter to Christen and that "my attorney is advising me that anything related to my employment situation be channeled through my attorney." Shah responded, "I don't believe it," and hung up. The meeting Shah had called appellant about was never scheduled or held. The May 5, 2000 letter from appellant's attorney stated, in part:
 {¶ 44} "I have been in consultation with your employee, Nicholas Sagonowsky, recently. His life and his family's life have been thrown into what can best be described as turmoil as he has been advised that his position with the company is in peril. He has been receiving threats ranging from job termination on the one hand to an unwarranted probationary period or demotion on the other hand.
 {¶ 45} "* * * Mr. Sagonowski can not conceive of any material acts of omission or commission which, under any circumstances, could justify a termination for cause. Yet, Mr. Sagonowsky has repeatedly been told that the company is moving towards job termination.
 {¶ 46} "* * * it should be apparent that your company is not providing Mr. Sagonowski with the psychological environment conducive to good health, well-being and the highest of performances. His energy and attention should be devoted to doing the job rather than fending off repeated attacks from his flanks.
 {¶ 47} "Therefore, it might be wise for you or your representative to consult with me about a meaningful severance package for Mr. Sagonowski. * * *."
 {¶ 48} On May 11, 2000, attorneys for the parties were unable to negotiate a severance package for appellant. Shah and Christen met with appellant, asked for his keys, and placed him on a leave of absence. On June 1, 2000, appellant's benefits were terminated. No severance package was ever agreed upon and appellant was terminated on June 30, 2000.
 {¶ 49} Given that the employment agreement between appellant and Andersons had no specific term of duration, we must start from the position that appellant's employment was terminable-at-will. Appellant, however, argues that because the principles and handbook are devoid of any reference to "at will" employment status, he is more than a mere at-will employee. We disagree. According to Phung, 23 Ohio St.3d 100, andHenkel, 45 Ohio St.2d at 254-255, in the absence of a contract which provides for a specific duration of employment, an employee is presumed to be employed at will, terminable at any time, with or without cause. If Andersons had specified that appellant was merely an at-will employee, it would merely have bolstered its defense. The absence of such a specification, however, does not change the presumption of law in Ohio that, unless otherwise stated, an employee is terminable at will. As such, we must next consider whether any language in the principles, handbook, or oral representations made by Andersons' employees altered appellant's at-will status.
 {¶ 50} Appellant asserts that an employment agreement, for an employment status other than at-will, was created based upon the following excerpts from Andersons' principles: (1) "* * * permanent employment status with Andersons represents a serious commitment by the Company, and that every reasonable effort should be made to provide continued employment for permanent members of the organization as long as they are willing and able to fulfill their responsibilities"; (2) "* * * job security remains a cornerstone of our relationship with our permanent employees"; and (3) "* * * the Company pledges its best efforts toward providing secure employment * * *." Appellant also asserts that the language in the handbook establishes that a permanent employee is something more than a mere at-will employee.[2] We disagree.
 {¶ 51} None of these excerpts show that Andersons made any clear and unambiguous promises to appellant of specific long term employment or that he could only be discharged for just cause." See Aeroquip Corp. v.Miller (Dec. 15, 1995), 6th Dist. No. L-95-080. Rather, these statements are qualified aspirational statements regarding job longevity and security. Appellant demonstrates no exchange of bilateral promises, consideration or mutual assent. See Bowes, 6th Dist. No. L-00-1017;Gargasz, 68 Ohio App.3d 149, 154; and Penwell, 84 Ohio App.3d 16.
 {¶ 52} Appellant asserts that the principles is "much more than an aspirational statement or ideal but is a clear and vivid reference to the U.S. Constitution and Amendments 1 through 10." Appellant's argument refers to the section in the principles, which states:
 {¶ 53} "We refer to the right to know the answers to the following for questions as the `Employee Bill of Rights':
• What is my job?
• What does the job pay?
• How am I doing?
• How can I improve?"
 {¶ 54} "* * * We believe that good job performance should be rewarded in both wage and opportunity for advancement. Conversely, if acceptable performance is not achieved, appropriate action to correct deficiencies is in order. * * *"
 {¶ 55} We find that the above "Employee Bill of Rights," while laudable, does not establish that Andersons contracted with appellant for a specific term or duration of employment, or change appellant's status to other than terminable at will.
 {¶ 56} Appellant additionally argues that insofar as the principles do not address the termination policy for "permanent" employees, by its absence, "it implies that a permanent employee will be given prior notice before being fired." Appellant also argues that, insofar as the principles distinguish between classes of employees, e.g., permanent, part-time, and seasonal, they imply that the job security for a "permanent employee" exceeds the traditional at-will doctrine.
 {¶ 57} We, however, find that "permanent" employment status does not change the employment relationship into one terminable only for cause.DeKoning v. Flower Mem. Hosp. (1996), 82 Ohio Misc.2d 20, 29. See also,Hudec v. Gordon Cooper Motor Sales, Inc. (Dec. 7, 1990), 6th Dist. No. OT-89-021. To the contrary, employment that provides for permanent employment, life employment, or other terms purporting permanent employment, "`where the employee furnishes no consideration additional to the services incident to the employment, amounts to an indefinite general hiring terminable at will of either party, and a discharge without cause does not constitute a breach of such contract justifying recovery of damages.' (Citation omitted)" Henkel, 45 Ohio St.2d at 255. See also,Mers, 19 Ohio St.3d at 102.
 {¶ 58} Additionally, we note that although an employee may be dismissed for not following an employer's code of regulations, "it does not necessarily follow that an employee's adherence to such rules will automatically preclude his or her dismissal for totally unrelated reasons." Pyle, 49 Ohio App.3d at 145. Andersons, however, stated that "as long as you are willing and able to fulfill your responsibilities to the company by satisfactory job performance, the company recognizes its obligation to make every reasonable effort to provide continued employment * * *." (Emphasis added.) This is not an absolute promise of job security in exchange for satisfactory job performance; rather, Andersons only pledges to make every reasonable effort to provide continued employment.
 {¶ 59} Moreover, with respect to the facts in this case, we find that it is questionable whether, by April 2000, appellant was willing to alter his supervision methods to comport with Andersons' requirements. Appellant never instituted another action plan, and rather than having a meeting about his performance and situation, appellant indicated to Shah that further employment related matters would have to go through his attorney. Despite Shah's statement that he felt appellant upheld his end of the bargain, such behavior is not indicative of someone who is willing to fulfill his responsibilities to the company.
 {¶ 60} Appellant further asserts that oral representations made by Bethel and Shah created a contract of employment which was not terminable at-will. As stated above, Bethel commented to appellant regarding the longevity of employees at Andersons and Shah commented that "you won't get rich at The Andersons, but you'll always have a job." Appellant argues that Shah's comments commit Andersons because "the requirement of [appellant's] satisfactory performance is gone and has been replaced with [appellant] conceding to reduced compensation." We disagree.
 {¶ 61} Concerning oral agreements, in order to determine the agreement's explicit and implicit terms concerning discharge, the court may consider the facts and circumstances surrounding the agreement, including the character of the employment, custom, the course of dealing between the parties, company policy, or any other fact which may illuminate the question. Mers at paragraph two of the syllabus. However, there must nevertheless be evidence which shows that the employer made "clear and unambiguous promises to appellant of specific long term employment or that he could only be discharged for just cause." AeroquipCorp. v. Miller (Dec. 15, 1995), 6th Dist. No. L-95-080.
 {¶ 62} Based on the alleged statements made, we agree with the trial court that they fall short of evidence that raises a genuine issue of material fact regarding the terms of the alleged implied contract of employment. General statements about job security are typically found not to be specific promises of continued employment. For example, in Handlerv. Merrill Lynch Life Agency, Inc. (1993), 92 Ohio App.3d 356, the court held that oral representations that the employer "was a company that provided security and stability for its employees," could not be "construed as promising future employment." Also, in Reasoner v. BillWoeste Chevrolet, Inc. (1999), 134 Ohio App.3d 196, the court held that oral representations to the employee that if he did a good job, he would have a job, was insufficient to find that the employer had made a specific promise of continued employment or employment for a specific period. Further, in Aeroquip, supra, we held that representations that a change in employment was considered a "career move" did not create an implied contract because there was no indication that the employer ever made any promise of employment for a specific length of time.
 {¶ 63} Appellant, however, argues that pursuant to Helmick v.Cincinnati Word Processing, Inc. (1989), 45 Ohio St.3d 131, the statements are sufficient to present a jury question. We again disagree. In Helmick, the statements made to the employee were specifically made to induce her into stopping her job search and to continue working at her job once she became dissatisfied with it. The record in this case does not demonstrate that statements made to appellant were specific promises of job security or that appellant was induced to his detriment to rely on these oral statements. See Helmick at paragraph three of the syllabus:
 {¶ 64} "Standing alone, praise with respect to job performance and discussion of future career development will not modify the employment-at-will relationship. A demonstration of detrimental reliance on specific promises of job security can create an exception to the employment-at-will doctrine. (Mers v. Dispatch Printing Co. [1985],19 Ohio St.3d 100, approved and followed." (Emphasis added.)
 {¶ 65} Appellant further argues that Andersons' disciplinary policy provides for a disciplinary procedure, prior to termination, which Andersons did not follow. Appellant argues that Anderson's failure to follow its disciplinary policy, upon which appellant relied, was a breach of appellant's employment agreement. Appellant asserts that there is "extensive precedent that allows that specific progressive discipline policies restrict employer's ability to terminate employees at-will, especially where the `at-will' relationship is not affirmed." Appellant cites the following cases in support of his argument: Mecurio v.Therm-O-Disc, Inc. (1993), 92 Ohio App.3d 131; Sowards v. Norbar, Inc.
(1992), 78 Ohio App.3d 545; Smullen v. Inerfact Polygraphs, Inc. (Oct. 3, 1991), 8th Dist. No. 58722; Randleman v. Dick Masheter Ford, Inc.
(Aug. 22, 1991), 10th Dist. No. 91AP-201; Miller v. BancOhio Nat'l Bank
(Apr. 23, 1991), 10th Dist. No. 90AP-380, 90AP-551; Danko v. MBIS, Inc.
(Sept. 28, 1995), 8th Dist. No. 658131; Bidwell v. Children's MedicalCtr. (Nov. 26, 1997), 2d Dist. No. 16402.
 {¶ 66} Andersons' disciplinary policy provided as follows:
 {¶ 67} "A. Discipline and Discharge
 {¶ 68} "The following procedure is to be followed in all cases of discipline and discharge. Exceptions to the procedure can be made when severe infractions occur. * * *
 {¶ 69} "* * * This procedure is necessary to assure the fair and equal treatment of all employees. * * * It is critically important that disciplinary action not be taken in anger, wrath, retaliation, or other conditions of unbalanced judgment.
 {¶ 70} "The procedure consists of the following, generally in the order listed: Verbal Warning, Written Warning, Disciplinary Layoff (optional), Discharge. It should be used as is for less serious offenses; examples might be attendance, cooperation with fellow workers or supervisors, work habits, safety performance. In the case of a serious offense it may be necessary to skip some or all of the initial steps in the disciplinary procedure and go immediately to the disciplinary layoff or discharge. This is permissible depending on the seriousness of the offense, work record of the employee, etc. Examples are: embezzling, theft, misrepresentation or falsification, intoxication, insubordination, abuse of Company property or equipment, fighting on Company property, etc. * * *
 {¶ 71} "E. Discharge
 {¶ 72} "Discharge is used when all other measures have failed to correct the employee's practice of performance, or the offense is serious; e.g., fighting, theft, destruction of property, etc. If there is agreement, the supervisor should then discuss the discharge with the employee. If there is no continued improvement and the supervisor feels that nothing can be gained by keeping the employee, they should first besure of the facts and then discuss the situation with the immediate supervisor and the Vice President of Personnel or the Vice President of Human Resource Development."
 {¶ 73} The Employee Handbook also sets forth Andersons' Disciplinary Policy, as follows:
 {¶ 74} "Like any well-run organization, we must have clearly understood rules of behavior for all members. Whenever these rules are disregarded, such behavior must be dealt with in a prompt, fair and consistent manner. The Company has, therefore, developed a discipline policy which serves as a guideline in these situations:
 {¶ 75} "Basically, the policy calls for progressive steps in dealing with a disciplinary problem. Normally, these steps would be as follows:
1. Verbal reprimand,
2. Written reprimand,
3. Disciplinary layoff,
4. Discharge.
 {¶ 76} "Depending on the seriousness of the offense, any or all of the steps preliminary to discharge may be skipped. To assure uniformity and fairness in application, the policy calls for the involvement of the Personnel Department in cases that may result in a disciplinary layoff or discharge. An employee has the right to appeal a disciplinary discharge by using the Open Door Policy."
 {¶ 77} The appellant is correct that, in each of the cases he cited, the court held that the disciplinary policy of the employer created a genuine issue of material fact regarding whether the employee could be terminated without just cause or, at the least, without the disciplinary steps being followed. We, nevertheless, find that, in this case, Andersons' disciplinary policy is not sufficient to create a genuine issue of material fact regarding whether there was an implied contract of employment that provided an alternative to the at-will relationship.
 {¶ 78} In each of the cases cited by appellant, the disciplinary policy stated that it was mandatory, specific, formal, or there was testimony from management that the disciplinary procedure was followed in all instances. Whereas, in this case, the disciplinary policy was not stated in absolute terms, but was qualified by noting that, depending on the seriousness of the offense, any or all of the steps preliminary to discharge may be skipped. Only in "less serious offenses" does the disciplinary policy specify that it should be used "as is."
 {¶ 79} The language in the disciplinary policy in this case is akin to those in Gargasz v. Nordson Corp. (1991), 68 Ohio App.3d 149; Duncanv. Bellemar Parts Industries Inc. (Sept. 12, 1991), 3d Dist. No. 14-91-12; and Jackson v. Martin-Brower Co. (Dec. 26, 1991), 8th Dist. No. 59560. In Gargasz, the manual clearly stated that depending on the "nature and circumstances" surrounding an employee's infraction, disciplinary action may be taken "ranging from reprimand to discharge." As such, the court held that the disciplinary procedure was not mandatory, but, rather, the employer "was merely publishing the possible penalties that may be taken for violating company policies, while maintaining discretion as to which penalty will be used." In Duncan, as in this case, the disciplinary policy provided that some or all of the steps could be bypassed. As such, the court held that the employer was not precluded from firing its employee without first following the step discipline procedure. And, in Jackson, the company reserved the right to discharge without prior warning.
 {¶ 80} Appellant, however, makes additional arguments with respect to his discharge. In particular, appellant argues that he could only have been fired due to business shutdown, poor performance, or an egregious, insubordinate act. Appellant asserts that he was not in a position where he needed improvement, insofar as he had received satisfactory performance reviews. Appellant also asserts, as evidence that he did not need to improve his job performance, that he was rewarded with a higher wage and opportunity for advancement during his three years of employment. We find appellant's arguments to be without merit. Contrary to his acceptable job reviews prior to March 29, 2000, after this date, the record demonstrates that appellant knew what the complaints were about his supervision methods and knew that his job was in jeopardy because of them. Moreover, we note that praise alone, with respect to job performance, does not modify the employment-at-will relationship.Helmick, 45 Ohio St.3d at paragraph three of the syllabus.
 {¶ 81} As such, contrary to appellant's argument, we find that Andersons was not restricted to terminating its permanent employees for only "just cause or incompetence or job elimination." Rather, the discharge policy states: "Discharge is used when all other measures have failed to correct the employee's practice of performance, or the offense is serious * * *." Based on the evidence in this case reasonable minds could conclude that Andersons exhausted all other measures to correct appellant's performance as a supervisor. Additionally, as discussed above, we find that appellant's policy does not create an agreement that appellant can only be discharged for just cause, incompetence, or job elimination. Rather, he was an at-will employee who could be terminated at any time with or without cause.
 {¶ 82} Appellant additionally asserts that he was hired on the basis of an initial probationary period and successfully passed this probationary period. Appellant argues that passing the probationary period entitled him to greater job security as a permanent employee. Appellant relies on Sowards v. Norbar, Inc. (1992), 78 Ohio App.3d 545, in support of this argument. We, however, find appellant's reliance onSowards is misplaced. The employer in Sowards had a mandatory disciplinary policy that applied to employees who had gotten past the company's probationary period. Andersons, however, does not have a mandatory disciplinary policy. As such, we find it is irrelevant whether appellant was once on probation and was later considered a "permanent" employee. As thoroughly discussed above, "permanent" employment status does not change the employment relationship into one terminable only for cause. See DeKoning, 82 Ohio Misc.2d 20, 29; and Hudec, 6th Dist. No. OT-89-021.
 {¶ 83} Appellant further argues that Andersons never offered him another job in the company. Even assuming this statement is true, we nevertheless find that there was no employment agreement guaranteeing appellant another job within the company. Rather, Andersons only aspired to "make every reasonable effort to provide continued employment." Moreover, there is no evidence that appellant detrimentally relied on this alleged promise insofar as he sought alternative employment by conducting a job search throughout April and May 2000.
 {¶ 84} Having found that no express or implied contract existed which would have changed appellant's employment at-will status, we must next consider whether Andersons was estopped from terminating appellant at will. The promissory estoppel exception to the employment-at-will doctrine holds that a promise which the promisor should reasonably expect to induce action on the part of the promisee and which does induce such action is binding if injustice can be avoided only by enforcement of the promise. Mers v. Dispatch Printing Co. (1985), 19 Ohio St. 3d 100, 104. We have held that "[i]f an employer is allowed to make unqualified and high-sounding promises of fair treatment and job security in order to obtain loyal and long-standing employees, and then disaffirm such promises and rely on the `at-will' doctrine (conspicuous by its absence in the employee's manual), injustice will frequently result." Jones v. EastCenter for Community Mental Health, Inc. (1984), 19 Ohio App.3d 19, 23.
 {¶ 85} As stated in Kelly v. Georgia-Pacific Corp. (1989),46 Ohio St.3d 134, paragraph three of the syllabus:
 {¶ 86} "The doctrine of promissory estoppel is applicable to at-will employment relationships. The test in such cases is whether the employer should have reasonably expected its representation to be relied upon by its employee and, if so, whether the expected action or forbearance actually resulted and was detrimental to the employee. (Mers,19 Ohio St.3d 100, explained and followed.)"
 {¶ 87} To establish promissory estoppel, we have held in Bowes v.Toledo Collision — Toledo Mechanical, Inc. (Aug. 18, 2000), 6th Dist. No. L-00-1017, that an employee "must first point to a `representation' by the employer that could be reasonably interpreted as limiting the employer's ability to terminate the employment relationship. Penwell v.Amherst Hosp., 84 Ohio App.3d at 19. Second, the employee must show that he changed his position in reliance on that representation to his detriment. Id. Third, the employee must show that his reliance was justified and reasonable. Id." The employer's promise must be clear and unambiguous in its terms, and the employee's reliance on such promise must be reasonable and foreseeable. Stites v. Napoleon Spring Works,Inc. (1996), 6th Dist. No. F-96-002.
 {¶ 88} As discussed above, we find that there were no clear and unambiguous promises made by Andersons, either in its employment documents, or through the oral representations of Shah and Bethel, which promised appellant a specific term of employment, specific terms for continued job security, or which reasonably could be interpreted as limiting Anderson's ability to terminate the employment relationship. In general, "[a] promise of future benefits or opportunities without a specific promise of continued employment does not support a promissory estoppel exception to the employment-at-will doctrine." Wing v. AnchorMedia, Ltd. of Texas (1991), 59 Ohio St.3d 108, paragraph two of the syllabus. Vague and ambiguous references to job security, and comments that the employee was making a "career move," are insufficient to support a finding that the employer made any clear and unambiguous promises to the employee of specific long term employment or that he could only be discharged for just cause. Aeroquip Corp., 6th Dist. No. L-95-080. The alleged promises in this case are distinguishable from the specific promises found to be made in cases such as, Jones, 19 Ohio App.3d 19,Kelly, 46 Ohio St.3d 134, Stites, 6th Dist. No. F-96-002, Wright v. Hondaof America Mfg., Inc. (1995), 73 Ohio St.3d 571, Helmick,45 Ohio St.3d 131, and Helle, 15 Ohio App.3d 1.
 {¶ 89} Nevertheless, even assuming arguendo that the statements made by Andersons and its employees reasonably could be interpreted by appellant as limiting Andersons' ability to terminate the employment relationship, appellant failed to establish that he detrimentally relied on such promises. Detrimental reliance, on representations and promises made by the company, has been found to exist in a number of cases where employees were terminated and the company did not comply with its promises. For example, we held that an employee relied to her detriment on her employer's attendance policy, which stated that absences due to occupational injuries would not count against an employee's total permitted absences, when the employee took leave due to an occupational injury, but was then fired for excessive absenteeism. Stites, 6th Dist. No. F-96-002. We also held that an employee relied to his detriment by continuing in his employment, even though he knew the company was closing, based upon representations to him that he would be receiving a certain amount of severance pay upon the closing of the business. Helle,15 Ohio App.3d 1.
 {¶ 90} The Ohio Supreme Court also has held that by continuing employment with the company, an employee established that he detrimentally relied on the statements and policies of the company which stated that the employee would be treated fairly and that, with respect to termination, he would be treated similarly to other employees with respect to pay, benefits, and possible reinstatement. Kelly,46 Ohio St.3d 134. Detrimental reliance was also found to exist when an employer promised job security and promotion in exchange for employee ceasing her job search prior to being hired and during her employment when she was dissatisfied with her job. Helmick, 45 Ohio St.3d 131. The Ohio Supreme Court further found that an employee detrimentally relied on the employer's handbook, which stated that employees who had relatives working in the same department would be transferred, but said nothing about termination, by not searching for alternative employment after discovering that her half-brother worked at Honda as well. Wright,73 Ohio St.3d 571.
 {¶ 91} Contrast these cases, where detrimental reliance was established, with our decision in Bowes v. Toledo Collision — ToledoMechanical, Inc. (Aug. 18, 2000), 6th Dist. No. L-00-1017. In Bowes, the employee was told that his job would be held open until a specific date and that, upon being released from his doctor's care, the employee could come back to work. When the employee attempted to be reinstated during the time period specified by the company, the employee was told he no longer had a job. We held that the employee failed to establish that he detrimentally relied on the employer's statements because, during his leave of absence, the employee stated that he searched for other jobs insofar as "the time in which he was ready to go back to work was approaching `and just in case I didn't have a job at Toledo Collision, I was going to have to find something.'"
 {¶ 92} In this case, we find that appellant failed to establish that he detrimentally relied on the alleged promises of Andersons and its employees. Appellant asserts that Andersons pursued him for the position of Engineering Manager and that he left BP because of Andersons' commitment to job security. We, however, find that appellant's assertions are not supported by the record. Appellant began his job search long before applying to Andersons because he was aware that the BP refinery in Lima would be sold and that his employment was not stable. He also testified that there was no opportunity for career advancement at BP. Under these circumstances, we find that there is no evidence to support that Andersons made a specific promise or inducement of job security to appellant in exchange for him giving up his job search, or job with BP, and working for Andersons, or that appellant detrimentally relied on these vague promises of job security. Contrast the facts in this case with Helmick, 45 Ohio St.3d 131.
 {¶ 93} Additionally, we find that appellant failed to establish that his continued employment with Andersons demonstrated that he detrimentally relied on Andersons' promises of job security or disciplinary procedures. As of March 29, 2000, appellant was aware that the company had serious problems with his methods of supervision and management, and that his job could be in jeopardy. In April 2000, appellant had begun a job search for employment outside of Andersons. As was the situation in Bowes, supra, we find that, by conducting a job search, even if appellant had once thought his job was secure, he was no longer relying on the alleged promises of job security and step disciplinary policies. Therefore, we find that appellant did not rely to his detriment on Andersons' alleged promises because, in response to him being warned that he may be terminated for poor performance, he sought alternative employment. We note that appellant turned down a job offer; however, we find that "merely turning down other employment inquiries does not present a jury question of substantial detrimental reliance."Wing, 59 Ohio St.3d at 111.
 {¶ 94} Appellant further argues, however, that he relied to his detriment in performing the tasks he was specifically hired to do pursuant to the IET survey. Appellant argues that he was hired to implement new procedures and "shake things up" and that, when the employees resisted the changes, appellant, "the coach," was fired instead of "the team." We find no support for this argument in the record. The complaints concerning appellant all dealt with matters such as his poor communication skills, his unavailability, his inability to make decisive decisions, and his inability to delegate responsibility to others. These complaints all had to do with appellant's supervisory and managerial skills, and had nothing to do with the programs and procedural changes he implemented pursuant to the IET survey. Accordingly, we find that there was no detrimental reliance on the IET survey.
 {¶ 95} Finally, appellant argues that Andersons had a leave of absence policy in place which it failed to follow. We disagree. The leave policy is discretionary as it specifically states, that it "may be granted by your supervisor (emphasis added)." Appellant asserts, however, that Andersons represented that benefits would continue throughout his leave of absence. We find that this is not supported by the record. On May 18, 2000, counsel for Andersons notified appellant's counsel that his unpaid leave of absence would continue through May 28, 2000.[3] There was a note written on the May 18, 2000 letter which stated that appellant's benefits would continue. Benefits continued through May 31, 2000, as indicated. On June 8, 2000, Andersons' counsel sent another letter to appellant's counsel indicating an extension through June 16, 2000, to accept the terms of the offered severance package. No mention, however, was made regarding appellant's benefits being extended throughout this period of time. Moreover, we note that the leave policy specifies that benefits during leave are to be paid by employee, not Andersons. As such, we find that appellant has failed to establish that Andersons breached any promise to appellant regarding the terms of his leave of absence.
 {¶ 96} Based on the lengthy discussion of appellant's arguments with respect to the first assignment of error, we find that there are no genuine issues of material fact which would preclude the granting of summary judgment with respect to appellant's claims of breach of contract and promissory estoppel. We find that reasonable minds could only conclude, after viewing the evidence in a light most favorable to appellant, that appellees were entitled to summary judgment with respect to these claims. We therefore affirm the trial court's February 28, 2000 opinion and find appellant's first assignment of error not well-taken.
 {¶ 97} Assignment of Error Number Two
 {¶ 98} Appellant argues in his second assignment of error that the trial court erred in granting judgment as a matter of law at the conclusion of appellant's case with respect to his claim of violation of public policy for being terminated in retaliation for consulting an attorney. We disagree.
 {¶ 99} There are four elements of a claim for discharge in violation of public policy: (1) a clear public policy; (2) a discharge that jeopardizes the policy; (3) evidence that the discharge was motivated by conduct related to the public policy; and (4) lack of any "overriding legitimate business justification for the discharge" on the employer's part. Painter v. Graley (1994), 70 Ohio St.3d 377, 384.
 {¶ 100} Appellees moved for summary judgment on this cause of action with respect to the first and third elements of a claim for discharge. In its November 20, 2002 decision, the trial court held that appellant had satisfied the first element, insofar as there was a clear public policy issue. With respect to causation, the trial court held that because of the proximity in time between Andersons' receipt of counsel's letter, and appellant being placed on a leave of absence, there remained a genuine issue of material fact regarding the issue of causation as it relates to appellant's claim of discharge in violation of public policy.
 {¶ 101} At trial, additional evidence regarding this claim was presented to the jury. At the conclusion of appellant's case, appellees moved for directed verdict on this claim. Civ. R. 50(A) governs when a trial court may grant a motion for directed verdict:
 {¶ 102} "(4) When granted on the evidence. When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue."
 {¶ 103} In construing the evidence most strongly in favor of the party against whom the motion is directed, the trial court "must neither consider the weight of the evidence nor the credibility of the witnesses." Strother v. Hutchinson (1981), 67 Ohio St.2d 282, 284, 285. Additionally, where reasonable minds might reach different conclusions regarding the evidence presented and where there is substantial, competent evidence to support the claim of the party against whom the motion is made, the motion for directed verdict must be denied. Kroh v.Continental Gen. Tire, Inc., 92 Ohio St.3d 30, 31, 2001-Ohio-59.
 {¶ 104} In granting the motion for directed verdict, the trial court found the following facts were undisputed. Prior to May 5, 2000, the date of counsel's letter, there had been numerous meetings between appellant and representatives of Andersons in an attempt to resolve what had been described as "serious issues." Discussions had been held concerning possible termination and what course of action should be taken.
 {¶ 105} Upon being informed that further discussions concerning appellant's employment should be directed to his attorney, the trial court held that there was no evidence that Shah reacted negatively. By that, the trial court mentioned that appellant continued in his position at Andersons and that Andersons did not terminate appellant on May 8 when he told them he would not directly discuss his employment status with them.
 {¶ 106} With respect to counsel's letter, the trial court stated that the letter was clear. It did not talk in terms of the other options being offered to appellant; rather, it clearly stated that it was wise for Andersons to talk with appellant's agent concerning a meaningful severance package. The trial court further stated that there was no evidence in the record that appellant's lawyer was authorized to discuss continued employment. In fact, the trial court noted that appellant testified at trial that his goal was to get a new job and a severance package. There was no evidence that there were ever discussions between appellant's counsel and Andersons' counsel concerning anything other than what would be an appropriate severance package.
 {¶ 107} The trial court also referred to the parties' stipulation, wherein they agreed that appellant was not terminated on May 11, 2000, but was merely placed on unpaid leave, which was eventually extended until June 30, 2000, when appellant was terminated. The trial court noted that Andersons did not walk away upon receiving appellant's counsel's letter, but engaged in discussions concerning severance packages and allowed for continuances of the period of leave in an attempt to arrive at a meaningful severance package.
 {¶ 108} The trial court concluded as follows:
 {¶ 109} "The court finds that when we look at all of the evidence relating to these elements, and we look at it in a light that would be most favorable to [appellant], we find that reasonable minds could only conclude, based upon the evidence presented and clearly the stipulation that has been entered, that it was [appellant's] own representative, his agent, that then decided that the only other solution for this was a meaningful severance package."
 {¶ 110} The trial court also held that reasonable minds could only find that Andersons did not terminate appellant because a lawyer was hired to explain what appellant wanted to do in reference to resolving this matter, which was to obtain a meaningful severance package. The trial court further held that appellant failed to produce substantial, probative evidence as to the fact that there was no overriding business justification as it relates to his ultimate termination, which appellant agrees occurred on June 30, 2000.
 {¶ 111} Appellant argues on appeal that the trial court held that appellant resigned and, therefore, circumstances surrounding his termination were irrelevant. We, however, hold that, contrary to appellant's assertions, the trial court did not conclude that appellant had resigned. Rather, the trial court correctly cited to the evidence in the record, which established that counsel's letter only mentioned a severance package and no other alternatives, that there was no evidence that counsel was authorized to discuss other alternatives, and that appellant testified that his goal was to get a new job and a severance package. Appellant argues that counsel's May 5, 2000 letter was conditional in nature and that, implicit in the language of the letter, was that appellant would remain at Andersons if no meaningful severance package could be worked out; however, such a finding is not supported by the evidence in the record.
 {¶ 112} Additionally, in response to the trial court's finding that appellant's counsel was not authorized to discuss continued employment, appellant asserts that the stipulation clearly indicated otherwise, when it stated, "Britz indicated that it was in the best interest of both The Andersons and Plaintiff to remain employed by The Andersons as opposed to being terminated." Upon review of the stipulation, however, we find that this statement was taken out of context. In actuality, it concerns an attempt by counsel to have the leave of absence extended into June, and has nothing to do with a request by appellant to have Andersons reinstate him as engineering manager or find him other employment in the company.
 {¶ 113} To demonstrate that he was terminated because he hired a lawyer, appellant cites to Shah's and Christen's testimony that they had an aversion to lawyers; Shah's statement that lawyers "have no place" in business; that Shah could not "believe" appellant hired an attorney; and Christen's testimony that he was "shocked." Appellant also argues that the trial court ignored the fact that appellant was discharged from his job within minutes after the May 11, 2000 severance package negotiation meeting. Further, appellant asserts that "the most appalling instance" of appellees' malice was the termination of appellant's benefits with only one day's notice. We disagree.
 {¶ 114} Regardless of Shah's and Christen's reaction to having a lawyer brought into appellant's employment situation, the fact is that appellant was not terminated on the spot and Andersons kept appellant as an employee, albeit on leave, throughout the severance package negotiations. With respect to appellant's argument that he was discharged from his job within minutes after the May 11, 2000 severance package negotiation meeting, we find that he was not terminated at that time, but placed on leave to allow the parties sufficient time to negotiate the severance package about which appellant had approached Andersons. Finally, appellant asserts that "the most appalling instance" of appellees' malice was the termination of appellant's benefits with only one day's notice. As discussed above with respect to appellant's first assignment of error, pursuant to counsels' letters, Anderson's had only agreed to extend benefits through May 28, 2000. Pursuant to its leave of absence policy, Andersons was under no obligation to continue paying for benefits to an employee who had been placed on leave. As such, there is no evidence that the termination of benefits was maliciously motivated.
 {¶ 115} With respect to the trial court's finding that appellant failed to establish a lack of any overriding legitimate business justification for the discharge, appellant argues that he "introduced mountains of evidence that he was doing a good job, that he had excellent evaluations, [and] that he had met his part of the bargain." As such, appellant asserts that if he was terminated, it was not for legitimate business purposes; rather, it was because a lawyer showed up to promote his case. We disagree. Based on the record in this case, reasonable minds could only conclude that Andersons had a legitimate business justification for the discharge. Appellant had been unable to rectify his poor work performance for approximately eight months and, ultimately, on April 8, 2000, refused to directly speak with his supervisors regarding his employment situation. Appellant had been warned a number of times that his poor performance could, and would, result in termination. Based on the record, we find that reasonable minds could only conclude that appellant's inability or unwillingness to rectify his job performance provided an overriding legitimate business justification for appellant's discharge.
 {¶ 116} Accordingly, we find that the trial court correctly granted appellees' motion for directed verdict on appellant's claim for discharge in violation of public policy. There was no evidence that appellant's discharge was motivated by conduct related to the public policy, and appellant failed to establish a lack of any "overriding legitimate business justification for the discharge" on the employer's part. SeePainter, 70 Ohio St.3d 377. As such, after construing the evidence most strongly in favor of appellant, we find that reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to appellant. Appellant's second assignment of error is found not well-taken.
 {¶ 117} Assignment of Error Number Three
 {¶ 118} In his third assignment of error, appellant argues that the trial court erred in refusing to allow him to cross-examine Christen on the basis of a prior inconsistent statement made under oath before the Ohio Revision of Employment Services. We disagree.
 {¶ 119} R.C. 4141.21 states that information maintained by the Ohio Bureau of Employment Services "shall not be open to the public or be used in any court in any action or proceeding pending therein * * *." See also, Pasanovic v. American Gen. Fin., Inc. (Sept. 17, 1992), 10th Dist. No. 92AP-561; and Crooks v. Consol. Stores (Dec. 21, 1999), 10th Dist. No. 99AP-29. We therefore find that the trial court was within its discretion in striking Christen's testimony concerning his testimony before the employment bureau. Appellant's third assignment of error is therefore found not welltaken.
 {¶ 120} Assignment of Error Number Four
 {¶ 121} Appellant argues in his fourth assignment of error that the trial court erred in granting summary judgment against appellant on his fraud claim in its November 20, 2002 decision. Appellant, however, states that "[i]f this court affirms the trial court on the implied contract of employment based on the original documents and conversations, this assignment of error will be moot." Accordingly, based on our decision with respect to appellant's first assignment of error, affirming the trial court's decision awarding summary judgment with respect to appellant's claims for breach of contract and promissory estoppel, we find appellant's fourth assignment of error is moot. We therefore find appellant's fourth assignment of error not well-taken.
 {¶ 122} On consideration whereof, the court finds substantial justice has been done the party complaining and the judgments of the Lucas County Court of Common Pleas are affirmed. Pursuant to App. R. 24, costs are assessed to appellant.
Judgment Affirmed.
A certified copy of this entry shall constitute the mandate pursuant to App. R. 27. See, also, 6th Dist. Loc. App. R. 4, amended 1/1/98.
Knepper, J., Pietrykowski, J., Singer, P.J., Concur.
[1] On March 1, 1997, Andersons changed the term "permanent" to "full-time." Charles Gallagher, Vice President of Personnel, notified employees, including appellant, that although the term had changed from "permanent" to "full-time," the company's commitment had not changed. Andersons then implemented the following definition for "full-time" status:
"The full-time status represents a serious commitment by the Company, and every reasonable effort should be made to provide continued employment for full-time members of the organization as long as they are willing and able to fulfill their responsibilities. Even though circumstances can arise under which continued employment might require the acceptance of alternate work at a reduced rate of pay, or under which it might be impractical or even impossible, job security remains a cornerstone of our relationship with our full-time employees."
[2] Appellant relies on the following language in the handbook in support of his argument: (1) Andersons "believes that the permanent employment status represents a serious mutual commitment between you and the Company," and (2) As long as you are willing and able to fulfill your responsibilities to the company by satisfactory job performance, the company recognizes its obligation to make every reasonable effort to provide continued employment although it may not always be possible to provide a job of equal pay."
[3] The May 18, 2000 letter stated: "The Andersons is willing to afford your client an unpaid leave of absence for one week, commencing on May 15th, and renewable for one final additional week, at your request. At that point in time, if Mr. Sagonowsky does not accept the final offer of The Andersons of a severance package for three and one-half months, with outplacement services, his employment at The Andersons will be terminated."