DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
 {¶ 1} Appellant, Charles R. Daff, appeals from the trial court's directed verdict in favor of Appellees, Scott Harcek, John Haumesser, David Campbell and Associated Materials, Inc. in the Summit County Court of Common Pleas. We affirm.
 {¶ 2} This action arose after Appellant Charles R. Daff was terminated from his employment with Appellee Associated Building Supplies, Inc., dba Alside ("Alside") on November 23, 2004, for dishonesty related to missing funds belonging to Alside. On May 27, 2005, Appellant filed a complaint in Mahoning *Page 2 
County against Alside and three employees of Alside, Appellees, Scott Harcek, John Haumesser, and David Campbell asserting claims of defamation, wrongful discharge in violation of the public policy of the State of Ohio and violation of the Ohio Whistleblower's Act. The case was transferred to Summit County on October 18, 2004, upon Appellees' motion. Appellees answered the complaint on November 8, 2005.
 {¶ 3} On June 27, 2006, Appellees filed a motion for summary judgment and Daff opposed that motion. On July 20, 2006, Appellant dismissed his whistleblower claim. The court granted Appellees' motion as to the wrongful termination claim only on August 10, 2006, leaving defamation as the only claim to be tried.
 {¶ 4} On August 11, 2006, Appellees filed a motion in limine to exclude from trial any testimony or exhibits evidencing Appellees' statements to the Ohio Department of Job and Family Services ("ODJFS") regarding Appellant's claim for unemployment benefits. The trial court granted Appellees' motion the same day. On August 14, 2006, trial commenced on Appellant's defamation claim. At the close of Appellant's case, on August 16, 2006, Appellees moved for directed verdict and the court granted the motion as to all Appellees and dismissed the case.
 {¶ 5} Appellant timely appealed the trial court's judgment entry directing the verdict in favor of Appellees and raises two assignments of error. *Page 3 
 Assignment of Error No. 2 "The trial court erred in granting [Appellees'] motion for a directed verdict made at the close of [Appellant's] case."
 {¶ 6} Appellant asserts that the trial court improperly granted Appellees' motion for directed verdict at the end of his case in chief. Specifically, Appellant asserts Appellees' allegations as to his theft and dishonesty were slander per se and were not made in good faith thereby negating Appellees' qualified privilege defense. Alternatively, Appellant asserts that Appellees exceeded any qualified privilege by making statements about Appellant with actual malice. Appellant argues that good faith and actual malice determinations are jury questions and that a reasonable juror could, in both instances, have found as Appellant proposes.
 {¶ 7} Appellees do not dispute Appellant's characterization of the defamatory statement as being slander per se but argue that they are protected by a qualified privilege as all communications were made internally to those who needed such information during the course of an internal investigation. Appellees assert that they acted in good faith and without actual malice thereby leaving the privilege intact. Finally, Appellees argue that there is no legal support for the argument that good faith or actual malice determinations are required to be made by a jury.
 {¶ 8} The decision to grant or deny a Civ.R. 50(A) motion for directed verdict is reviewed de novo. Goodyear Tire Rubber Co. v. Aetna Cas. Sur. *Page 4 Co., 95 Ohio St.3d 512, 2002-Ohio-2842, at ¶ 4. Directed verdict is proper if upon viewing the evidence in a light most favorable to the non-moving party and presuming any doubt to favor the non-moving party reasonable minds could come to but one conclusion, that being in favor of the moving party. Civ.R. 50(A)(4); Goodyear at ¶ 3. Such a decision does not determine factual issues, but only questions of law; even though it is necessary to review and consider the evidence in deciding the motion. Goodyear at ¶ 4. "Neither the weight of the evidence nor the credibility of the witnesses is for the court's determination in ruling upon [directed verdict]." Osler v. Lorain (1986), 28 Ohio St.3d 345,347.
 {¶ 9} When a "party opposing the motion for a directed verdict fails to present evidence on one or more of the essential elements of a claim, a directed verdict is proper." White Hat Mgmt. L.L.C. v. Ohio FarmersIns. Co., 167 Ohio App.3d. 663, 2006-Ohio-3280, at ¶ 7, citingHargrove v. Tanner (1990), 66 Ohio App.3d 693, 695. In White HatMgmt, we noted that:
 "[W]hen such substantial evidence is presented that reasonable minds could come to differing conclusions, the court should deny the motion. Posin v. A.B.C Motor Court Hotel, Inc. (1976), 45 Ohio St.2d 271, 275. Under the `reasonable minds' portion of Civ.R. 50(A)(4), the court is only required to consider whether there exists any evidence of probative value in support of the elements of the nonmoving party's claim. See Coleman v. Excello-Textron Corp. (1989), 60 Ohio App.3d 32, 40; Ruta [v. Breckenridge-Remy Co. (1982)], 69 Ohio St.2d [66,] 69.]" White Hat Mgmt. at ¶ 7.
 {¶ 10} "In an action for defamation, the plaintiffs prima facie case is made out when he has established a publication to a third person for which defendant is *Page 5 
responsible, the recipient's understanding of the defamatory meaning, and its actionable character. Defendant may then invoke various defenses, if available. One of these is known as `qualified privilege[.]'" Hahn v. Kotten (1975), 43 Ohio St.2d 237, 243.
 "`A qualified or conditionally privileged communication is one made in good faith on any subject matter in which the person communicating has an interest, or in reference * * * to which he has a right or duty, if made to a person having a corresponding interest or duty on a privileged occasion and in a manner and under circumstances fairly warranted by the occasion and duty, right or interest. The essential elements thereof are good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion, and publication in a proper manner and to proper parties only.'" Hahn, 43 Ohio St. at 244, quoting 50 Am. Jur.2d 698, Libel and Slander, Section 195.
 {¶ 11} This Supreme Court then went on to note the limited nature of the qualified privilege as we noted in Gugliotta v. Morano,161 Ohio App.3d 152, 2005-Ohio-2570.
 "However, the protections of qualified privilege are not unfettered; the Hahn court held that defamatory statements made with actual malice defeat the protection of qualified privilege. Id. at paragraph two of the syllabus. In this context, `actual malice' is defined as `knowledge that the statements are false' or making the statements `with reckless disregard of whether they were false or not.' Id., citing New York Times v. Sullivan, (1964), 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686." Gugliotta at ¶ 68.
 {¶ 12} Appellant's defamation claim asserts that Appellees falsely accused Appellant of "taking money out of the `boneyard' box for himself." Appellant then asserts that Appellees orally published this allegation to employees of Alside. Appellant asserts that the statements were not made in good faith for three *Page 6 
reasons: (1) during the course of the investigation, two of Alside's management team (the plant president and human resources director) told the investigating committee that they did not believe the evidence was sufficient to conclude Appellant has stolen money; (2) the investigation was not properly or thoroughly conducted; and (3) Appellant was denied the right to be represented by counsel during the course of the investigation.
 {¶ 13} In directing the verdict, the trial court noted the difficulty of its decision, but held that while Appellant may have established the elements of a claim for defamation, there was no evidence to demonstrate that the statements were published outside of the inner circle of Alside and/or outside the scope of the investigation. The trial court found Appellees to be protected by the qualified privilege without addressing the good faith component of the defense. The trial court also found no evidence of actual malice noting that while the investigation could have been more thorough, the evidence presented as to the scope of the investigation failed to demonstrate a reckless disregard of the truth of the statements made.
 {¶ 14} From our review of the record, we conclude that Appellees properly asserted and the trial court properly found that Appellees were protected by a qualified privilege, which privilege was not negated by actual malice. Appellees had an interest to uphold; specifically, they had an interest in ensuring that Alside funds were properly recorded and/or maintained. Any statements were limited in *Page 7 
scope and there was no evidence that statements were made to anyone outside of the usual course of the internal investigation.
 {¶ 15} On the last element of the qualified privilege, the issue of good faith, we initially note that Ohio law does not require that determinations of good faith, in the context of a qualified privilege defense to a defamation claim, be made by a jury. The cases cited by Appellant for this proposition do not support such a rule. InFawcett v. G.C. Murphy Co. (1976), 46 Ohio St.2d 245, the Supreme Court found that under the facts of the particular case before it, the question of good faith was properly submitted to a jury. In Straus v.Doe, 11th Dist. No. 2003-L-082, 2004-Ohio-5316, the court simply noted that "[w]hether a party acts in good faith is generally a question left to the trier of fact." Straus at ¶ 32 (Emphasis added) InStraus, the court noted that "where a plaintiff can demonstrate facts establishing a reasonable question regarding a defendant's state of mind at the time in question, a material issue of fact remains on the issue of good faith." Id. (finding "a jury could reasonably find that the parties' inimical past motivated [defendant] to file her [defamatory] report" and that "[s]uch a finding would suggest that [defendant's] actions were motivated by something less than good faith." Id. at ¶ 33). There was no evidence presented at trial of any improper motive and/or that Appellees acted other than in what they believed to be the best interest of Alside.
 {¶ 16} Ohio law holds that the issue of good faith need only be submitted to a jury where the facts surrounding the alleged defamatory communication are in *Page 8 
dispute. Mauk v. Brundage (1903), 68 Ohio St. 89, at paragraph two of the syllabus; Becker v. Toulmin (1956), 165 Ohio St. 549, 554; A B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. Constr. TradesCouncil (1995), 73 Ohio St.3d 1, 8. Appellant asserts in his reply that the controlling facts of the instant matter are not conceded and that, therefore, the issue should have been submitted to a jury under the authority of Mauk, Fawcett, and Straus, supra.
 {¶ 17} After reviewing the record in a light most favorable to Appellant, we conclude that the controlling facts were not in dispute. The evidence at trial was that some amount of money was missing from the bone yard cash box, that Appellant was terminated because of the missing money, and that statements as to why Appellant was terminated were made only within the internal management group. It is true that the investigation was not conducted perfectly and there is differing testimony as to the exact amount of money that was missing, but the facts that support Appellant's defamation claim, i.e., that the Appellees published statements indicating that Appellant was terminated for theft or being dishonest are not in dispute. Thus, the question of whether or not the Appellees acted in good faith in making these statements is a question of law.
 {¶ 18} Our review of the record indicates that Appellant failed to provide evidence sufficient to establish that any statement about Appellant's termination and the reason therefore was made in bad faith and/or with actual malice, which would negate the qualified privilege. *Page 9 
 {¶ 19} Eight witnesses testified at trial, all called to testify by Appellant: Robert Fink (the former plant manager); Heather Burg (the former plant human resources manager); Brian Soliday (a plant supervisor), Robert Swisher (the customer that bought the bone yard windows from the plant as part of the sting operation); John Haumesser (Appellee and vice president of human resources for Alside's parent company; David Campbell (Appellee and general counsel for Alside's parent company); Scott Harcek (Appellee and vice-president of operations for Alside's parent company; and Appellant.
 {¶ 20} We initially note that Appellant testified that he had been unable to identify a single person that Appellees told, outside of the management team, that Appellant was a thief or was dishonest. While Appellant testified that Appellees made him the scapegoat for the questionable bone yard window practice when pressure came from corporate superiors, he acknowledged that he testified differently in his deposition. In deposition, he indicated that he knew of no reason that Appellees had to act with malice, ill will or hatred towards him.
 {¶ 21} Appellant acknowledged that it was he that told several employees of Alisde about the facts surrounding the investigation and his termination within a week or so of his termination. Some of the people he told passed on the information to other people in an effort to write a group letter to Alside in support of Appellant. Appellant acknowledged that Appellees had not given information *Page 10 
to the any of the people that signed the letter. Appellant also acknowledged that no one in the community knew why he was discharged and he now has a new job.
 {¶ 22} Finally, Appellant testified that he suffered from stress the first few months after his termination but was not treated by a doctor. He still maintained relationships with his friends at Alside. He has not been affected, other than the loss of a job, by his termination. Nothing that Alside did prevented him from getting a new job and, in fact, he was able to get a new job although at a slightly lower salary.
 {¶ 23} Mr. Fink, the plant manager at the time Appellant was terminated testified that he was aware that bone yard windows were sold by shipping manager Mr. Hower, who was also terminated. Mr. Hower gave the money (usually cash) to Appellant who placed it in a locked cash box to be used for miscellaneous plant expenses. He acknowledged that there was no record-keeping process in place for this money although there were records of money that was spent. Everyone knew about the bone yard window practice. When Mr. Fink became plant manager, Appellant advised him of the bone yard window practice and asked him if he would like to take over the management of the money. Mr. Fink advised Appellant to continue handling the money as he had been doing. Appellant usually came to him to advise him prior to spending any bone yard window money and all of the expenditures were for company purposes. *Page 11 
 {¶ 24} Mr. Fink was not part of the investigation of the missing bone yard money, although he was present when Appellant was initially questioned and testified that Appellees were aggressive in their questioning. Mr. Fink did not believe Appellant stole the money and he told management about his belief during the investigation. He did not, however, protest or take any action against Alside's decision to terminate Appellant.
 {¶ 25} No employees of Alside, outside the management team, said anything to Mr. Fink about the allegations against Appellant. Mr. Fink was present when Appellee Harcek notified the staff that Appellant no longer worked for Alside. Mr. Harcek did not say anything to the staff about the honesty of Appellant and/or that he was terminated. To Mr. Fink's knowledge nothing disparaging was ever said to plant employees about Appellant and the company never distributed any writing plant-wide about Appellant leaving Alside. Mr. Fink acknowledged documents kept in Appellant's personnel file would have contained more information as to why Appellant was terminated, but Mr. Fink did not know who would have access to these documents, other than Ms. Burg, the human resources director at the plant.
 {¶ 26} Heather Burg was the human resources manager at the plant. She testified that she was aware that bone yard windows were sold and how the money was used but did not know who kept the cash box and/or who decided how to spend the money. *Page 12 
 {¶ 27} She first became aware of the situation with Appellant when she was asked to get Mr. Hower and come to the corporate office on November 23, 2004, the day Appellant was terminated. She remained with Mr. Hower when he was questioned by the individual Appellees. Mr. Hower told them a customer had purchased bone yard windows over the weekend and paid in cash, which money he gave to Appellant. Mr. Hower initially denied taking any of the money but later admitted that Appellant had given him $500 to take his wife out to dinner.
 {¶ 28} Ms. Burg was also present during at least one of Appellees' interviews with Appellant. The individual Appellees were present at all interviews. She does not recall anyone directly stating that Appellant stole the bone yard money, but it was their belief that the evidence supported the facts that money was missing and that Appellant was responsible. Appellees knew money was missing because they knew how much money Mr. Swisher had paid for the windows and how much money was in the box ($1,100 or $1,200). Appellees had told her that the customer had paid $2,000 to $3,000 for the windows, but she did not verify this with the Mr. Swisher.
 {¶ 29} The management team discussed terminating and/or suspending Mr. Hower and Appellant because Mr. Hower admitted taking company money and the money was Appellant's responsibility. Ms. Burg testified that she told the individual Appellees that she believed that Mr. Hower should be terminated but that Appellant should be put on unpaid suspension because there was no proof of *Page 13 
wrongdoing against him except for bad accounting practices. Mr. Fink also expressed his reservations about Appellant's termination to the Appellees but their opinions were disregarded and both Mr. Hower and Appellant were terminated.
 {¶ 30} She was not involved in the investigation from the onset although she believes as the human resource manager, she should have been. There were no written statements taken related to the investigation and based on her expertise and training in human resources, it is a best-practice to put everything in writing. To her knowledge, Mr. Swisher was never questioned and no one saw him pay for the windows. She did not recall Appellant ever asking for an attorney during the investigation. If he had, it would have been her practice to stop the conversation and proceed only with the information already gathered when an employee asks for outside representation during an investigation. Appellant never admitted to any wrongdoing during the investigation. To her knowledge there was no further investigation of the matter after Appellant was terminated.
 {¶ 31} To her knowledge Appellees did not tell anyone outside of the management team that was investigating the circumstances surrounding Appellant's termination about why Appellant was terminated. She never saw Appellees act in any way that would violate company policy against disclosure of details related to a termination. She and Mr. Fink told the supervisors that reported to Appellant that Appellant had left the company. No details of his departure were given at that meeting. *Page 14 
 {¶ 32} Ms. Burg identified Exhibit 14, the personnel action form related to Appellant's termination. The form indicates that Appellant was terminated for violation of company policy. Appellees Haumesser and Campbell told her that the reason for the termination was missing money; they did not specify what policy was violated. She sent that document to the human resources administration department at the corporate offices. The only person to whom she spoke about the matter was her assistant, Cassi Clements. She told Ms. Clements that Appellant was terminated for a violation of company policy.
 {¶ 33} Brian Soliday was (and is) a supervisor at the Alside plant and is Appellant's friend. He was familiar with the bone yard window practice in place prior to the date of Appellant's termination, November 23, 2004. Customers would buy the windows from the shipping manager and the cash would go in the bone yard box maintained by Appellant. The money was used for miscellaneous plant expenses. Appellant always required a receipt for those expenses. Everyone at the plant knew about the bone yard practice including the plant manager, Mr. Fink.
 {¶ 34} In November of 2004, Mr. Soliday was asked to come to the corporate offices and was questioned by the individual Appellees about the bone yard procedure. He was asked if he was aware that money was missing from the bone yard box. Appellant's name was not mentioned, but Appellant did not work at Alside after that day. No one told Mr. Soliday that Appellant was terminated for *Page 15 
skimming money, but later, rumors surfaced about the reason for his departure. Mr. Soliday first found out exactly what happened from Appellant, not from anyone at Alside.
 {¶ 35} Appellee Harcek held a meeting with Mr. Soliday and other supervisors and told them that Appellant had been released without giving a reason. There was no suggestion by Appellees that Appellant had been released because of dishonesty or theft. Shortly thereafter, a letter was written to Ken Bloom, the CEO of Alside's parent company (exhibit 18). The letter was signed by seventeen people, including Mr. Soliday, in support of Appellant. The letter said, "[w]e understand how the situation and how the facts must look." That meant they knew that money was missing. The letter was circulated among the employees for signature.
 {¶ 36} Mr. Swisher was the customer who bought windows with the marked money. He has been buying bone yard windows from Alside for 10 or 12 years, two to three times per month. He met Appellant in January of 2003, and had a conversation with him and Mr. Hower during which they stated that they preferred Mr. Swisher pay for windows with cash because that money became part of the plant slush fund while check payments had to be taken to the front office.
 {¶ 37} Several years later, he was at the Canton Alside plant and the manager asked him about his purchase of bone yard windows from the Cuyahoga Falls plant. He told the manager that he had not been buying them for awhile *Page 16 
because the Cuyahoga Falls plant was low on stock. She asked him about a particular transaction and payment therefore and then called the accountant at Alside corporate to determine if his payment for this transaction had been recorded. The accountant then called and questioned him personally about the transaction. A few minutes later, Appellee Harcek called him and asked him to participate in an investigation whereby they would make copies of currency and purchase bone yard windows from the Cuyahoga Falls plant with that currency so as to enable Alside to trace the funds (the "sting"). He called Mr. Hower, the shipping manager, on the Friday before Appellant was terminated (November 19, 2004) and discussed the details of the transaction, which was set to occur the next day. His wife then copied 30 $100 bills. Mr. Swisher identified Exhibit 15, a multi-page document as the copy of the bills he had used in the sting.
 {¶ 38} On Saturday Nov. 20, 2004, he made the planned purchase at Alside, paying Mr. Hower $3,300, $3,000 of which was the marked money. Mr. Hower put the money in his pocket. He acknowledged that he had $2,000 in additional money that he had not copied. He wrote down in his records the amount he paid, but did not produce those records because Alside never asked him to do so.
 {¶ 39} On the following Tuesday (Nov. 23, 2004), he was contacted by Alside to fax the copies of the bills he used in the sting. They also asked him how much money he had paid on Saturday and he confirmed that he had paid $3,300. He did not speak to anyone at Alside after that day but he would have cooperated *Page 17 
had they wished to question him further about the transaction. No one ever told him that Appellant was terminated or why.
 {¶ 40} Appellee John Haumesser is the vice president of human resources for Associated Materials, Inc., the parent company of Alside. Mr. Haumesser was aware of the bone yard window practice prior to November of 2004, and acknowledged that there was not a written company policy governing the practice. After a conversation he had with the manager of the Canton plant in November of 2004, he and Mr. Harcek devised the sting operation. After the sting, Mr. Harcek informed him that he had traced the marked money to the bone yard cash box and that money was missing from the box.
 {¶ 41} Mr. Haumesser participated in the interviews of Appellant. Present with him were Mr. Fink and Appellees Harcek and Campbell. Initially, Appellant told them he thought he got $1,500 from Mr. Hower. Later, he told them he did not know how much money he got from Mr. Hower because he had not counted it. Mr. Haumesser believed that Appellant changed his story when he realized that 15 of the marked $100 bills were not in the cash box. It was Appellant's change of story that convinced him that Appellant was being dishonest and had taken the money. Mr. Haumesser considered the fact that Mr. Hower could have all of the missing money, but determined that after Mr. Hower confessed to receiving $500 there was no reason for him to lie about the rest. He cannot recall if there was a discussion between Appellees about this possibility. The management team was *Page 18 
all in agreement that Appellant and Mr. Hower had to be terminated. He did not recall Ms. Burg ever disagreeing with the decision prior to the termination. He recalled Ms Burg expressing her concern about the decision the following day.
 {¶ 42} Appellant was threatened with criminal prosecution during the investigation. Appellant asked to have his attorney present during questioning, which request was denied. Appellant never admitted to any wrongdoing. Appellees never found any of the marked bills in Appellant's possession and no one saw him take any of the money. They did not search his vehicle. After November 23, 2004, there was no further investigation into the missing money. They did not obtain written statements from Mr. Swisher, Mr. Hower or Appellant and the incident was never reported to the police.
 {¶ 43} Mr. Haumesser acknowledged that Appellant was a good employee and had received awards at the company for his performance as well as bonuses, merit raises and promotions. If Alside was contacted by a potential employer interested in hiring Appellant, it was company policy that they would verify his date of employment and position held but would provide no other information.
 {¶ 44} Mr. Haumesser acknowledged Exhibit 14, the personnel action notice, which indicated that Appellant was terminated for violation of company policy. Mr. Haumesser testified that Appellant was terminated because he was dishonest and took money that did not belong to him. He expressed this belief only to the investigation team, Appellee Campbell, Ms. Burg, Mr. Bloom (then *Page 19 
president of the siding and windows division), and Mr. Fink. Mr. Bloom was notified because it was common procedure to advise him of the termination of a highly valued employee, which Appellant was. He knows of no other communications (written or otherwise) that indicated Appellant was dishonest.
 {¶ 45} Mr. Haumesser acknowledged that Tom Tinnirello, the former human resources manager at Alside, came to him prior to November 2004, about a potential ethical problem with the bone yard window practice. Mr. Haumesser, who was doing ethics training at the time, did not determine the practice to be an ethical problem but expressed concern about the lack of financial control. He did not, however, institute a policy to change how the bone yard window payments were being handled.
 {¶ 46} Appellee Campbell is the general counsel for Associated Materials, Inc., Alside's parent company. He and the other Appellees instituted the sting in November 2004. He indicated that although he knew bone yard windows were sold from the plant, he was not aware of how the money was handled or the existence of the cash box.
 {¶ 47} Mr. Campbell interviewed Appellant twice during the investigation on November 24, 2004. He, Mr. Fink and Appellees Harcek and Haumesser conducted the first interview, which was exploratory in nature. They wanted to find out how Appellant was involved in the transaction with Mr. Swisher that took place on November 20, 2004. They had already spoken to Mr. Hower who told *Page 20 
them he gave the money to Appellant so the main issue under investigation was the location of the money. They had already determined that the money from the sting had not been given to the accounting department.
 {¶ 48} During the initial interview, Appellant told them he received money from Mr. Hower, put it in the lock box and put it in his desk drawer. Appellant told them he had not taken anything out of the box since he put the money in on November 20th. During questioning, Appellant asked if he needed a lawyer and Mr. Campbell told him they were not going to stop the investigation until Appellant retained an attorney.
 {¶ 49} During the second interview, Appellant told them that Mr. Hower had given him $1,500. After they told him that there was only $1,000 in marked bills in the box, he told them that he was not sure how much money Mr. Hower had given him. Mr. Campbell said to Appellant, "You took the money, didn't you?" Appellant continued to deny that he took the money. Appellees were investigating the missing money under the assumption that Mr. Swisher had paid for the windows on Saturday with $3,000 in marked $100 bills; they did not find out until later that Mr. Swisher had paid with both marked and unmarked bills. They did not conduct any further investigation after terminating Appellant. They did not ask Mr. Swisher for a written statement.
 {¶ 50} Appellee Campbell acknowledged telling Appellees Harcek and Haumesser that he believed Appellant had stolen at least $500 because Appellant *Page 21 
had admitted he had $1,500 on Saturday and only $1,000 of the marked money was in the box. He does not recall telling Ms. Burg or Mr. Fink that Appellant had stolen the money. Ultimately Appellant was terminated for giving Mr. Hower $500 and as the party responsible for at least $500 missing from the cash box. Mr. Campbell indicated that there was $1,900 in total in the box, but only $1,000 in marked bills. They did not do an investigation to determine how much money was in the box before the sting. The decision to terminate Appellant was a group decision. No member of the management team disagreed with this decision. Mr. Campbell never made any statement to anyone (outside of the management group) that Appellant was a thief.
 {¶ 51} Mr. Harcek is the vice president of operations for Associated Materials, Inc., Alside's parent company. He was aware of the bone yard window practice prior to 2004. That practice was to include a record of all funds going in and out of the cash box. The last record of incoming funds was in February 2004. Mr. Harcek acknowledged that Appellant came to him with concerns about the bone yard cash box procedure and he never instructed Appellant about what the correct procedure was to be assuming that Appellant would continue to follow the correct procedure.
 {¶ 52} On November 23, 2004, there was $1,900 in the cash box kept in Appellant's office. He did not know how much money was in the box on November 19, 2004, the day before the transaction with Mr. Swisher and they did *Page 22 
not conduct any investigation to find this information out. Appellant offered Appellees the opportunity to search his person and his vehicle, but they did not do so assuming that Appellant would no longer have the money in those places three days after the transaction.
 {¶ 53} Mr. Harcek had a conversation with Mr. Swisher on Monday, November 22, 2004. Mr. Swisher told him he purchased 140 to 145 windows and paid $3,000. He acknowledged that he did not recall the specific dollar figure during his deposition, but indicated that he now remembered it. He acknowledged that different figures were discussed as to how much money was missing but everyone agreed that some money was missing. Neither Ms. Burg nor Mr. Fink expressed their disagreement with the decision to terminate Appellant.
 {¶ 54} Mr. Harcek notified his boss, Mr. Bloom, that Appellant was fired for theft, but made no statements to anyone else, outside of the management team, that Appellant was a thief, stole money or was dishonest. To his knowledge, no one at Alside made any such statements to anyone outside the management team.
 {¶ 55} Based on the above, it is clear that while the investigation was less than thorough and not documented as well as it should have been, at least the majority of the management team supported the decision to terminate Appellant. There is no evidence that Appellant was terminated for any other reason than the missing money from bone yard window box. It is equally clear that statements *Page 23 
regarding Appellant's termination and the reasons therefore, were made to no one outside the management team (Appellees, Ms. Burg, Mr. Fink and Mr. Bloom).
 {¶ 56} Finally, Appellant has cited this Court to no law to support his proposition that the denial of an employee's request for counsel during an internal company investigation is indicative of bad faith. In each of the cases cited by Appellant, the employee was terminated because they consulted an attorney.
 {¶ 57} Based upon the record, we conclude that the trial court's decision granting directed verdict was proper. Reasonable minds could only conclude that Appellees made statements related to Appellant's termination in good faith thereby preserving the qualified privilege. Moreover, there is absolutely no evidence that any statement was made with actual malice, even when construing the evidence presented in a light favorable to Appellant as we are required to do. In fact, Appellant himself testified in deposition that Appellees did not act with malice. Absent any evidence of actual malice or reckless disregard, the trial court properly held the qualified privilege to be in tact as a matter of law and Appellant could not prevail on his claim for defamation.
 {¶ 58} Appellant's second assignment of error is overruled.
 Assignment of Error No. 1 "The trial court erred in refusing to allow [Appellant's] Exhibit 16 to be identified and admitted into evidence in this case." *Page 24 
 {¶ 59} Appellant asserts that the trial court improperly granted Appellees' motion in limine to exclude and, in fact, did exclude Appellant's Exhibit 16 from being admitted into evidence. Exhibit 16 was a document drafted by Appellee Campbell and given to Heather Burg, a human resources employee of Alside. The document included a statement that Appellant skimmed $500 from cash belonging to Alside.
 {¶ 60} We initially note that "[a] motion in limine is commonly used as a tentative, precautionary request to limit inquiry into a specific area until its admissibility is determined during trial." Regec v.Johnson (Mar. 31, 1993), 9th Dist No. CA-15838, at *2, citingRiverside Methodist Hosp. Assn. v. Guthrie (1982), 3 Ohio App.3d 308,310; see, also State v. Grubb (1986), 28 Ohio St.3d 199, 201-02. "As a tentative, interlocutory, precautionary ruling, ` * * * finality does not attach when the motion is granted.'" Id., quoting Grubb at 202; see, also Dent v. Ford Motor Co. (October 21, 1992), 9th Dist. No. 5289, at 4.
 {¶ 61} "An order in limine, therefore, is a preliminary ruling and is not a basis for error on appeal." Regec at *3, quoting Ireland v.Albrecht Grocery Co. (May 27, 1987), 9th Dist. No. 12725, at 2. Accordingly, this Court's review "will not encompass an alleged violation of an in limine order, but the ultimate ruling made during trial when the matter presented itself for evidentiary ruling."Regec at 3. Where a party seeks this Court's review of evidence excluded by the trial court, *Page 25 
 "This Court has previously held that in order for an appellate court to review the propriety of the exclusion of evidence, the party claiming prejudice must proffer into the record the substance of the excluded evidence. Nurse Griffin Ins. Agency v. Erie Ins. Group (Nov. 7, 2001), 9th Dist. No. 20460, at 4; see, also, Evid. R. 103(A)(2). By proffering the excluded evidence, this Court is able to `determine whether or not the [ruling] of the trial court [was] prejudicial.' (Emphasis sic.) Id., at 4, 572 N.E.2d 823, quoting Smith v. Rhodes (1903), 68 Ohio St. 500, 505, 68 N.E. 7." Drew v. Marino, 9th Dist. No. 21458, 2004-Ohio-1071, at FN 1.
Here, Appellant's counsel proffered the exhibit at issue (Exhibit 16) and thus preserved this issue for appeal.
 {¶ 62} This Court will not disturb "a decision regarding the admission or exclusion of evidence absent an abuse of discretion that has materially prejudiced the appellant." Nationwide Life. Ins. Co. v.Kallberg, 9th Dist. No. 06CA008968, 2007-Ohio-2041, at ¶ 20, citingState v. Sage (1987), 31 Ohio St.3d 173, 182; see, also, State v.Ali (Sept. 9, 1998), 9th Dist. No. 18841, at *2. An abuse of discretion is more than an error of law or judgment, but rather, it is a finding that the court's attitude is unreasonable, arbitrary or unconscionable.Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219. Under this standard of review, an appellate court may not merely substitute its judgment for that of the trial court. Pons v. Ohio State Med. Bd.
(1993), 66 Ohio St.3d 619, 621.
 {¶ 63} Appellees contend that the trial court properly excluded Exhibit 16 from evidence based on R.C. 4141.21, which states:
 "[T]he information maintained by the director of job and family services or furnished to the director by employers or employees pursuant to this chapter is for the exclusive use and information of *Page 26 
the department of job and family services in the discharge of its duties and shall not * * * be used in any court in any action or proceeding pending therein, or be admissible in evidence in any action[.]"
Appellees assert that Exhibit 16 was prepared by Mr. Campbell and given to human resources solely to respond to Appellant's claim for unemployment benefits.
 {¶ 64} Appellant asserts that the document was part of his personnel records and was obtained through the course of discovery as evidenced by the Bates label at the bottom of the document. Appellant asserts that R.C. 4141.21 only excludes from admission documents obtained from ODJFS files or evidence presented at a hearing before the ODJFS, but does not exclude the identical document if obtained from another source.
 {¶ 65} This Court has not addressed the scope of the evidence exclusion language of R.C. 4141.21 but our review of the plain language of the statute, as well as cases from other districts support our decision that the trial court abused its discretion in excluding Exhibit 16 from evidence. The Ohio Supreme Court has not spoken on this issue.
 {¶ 66} In Pasanovic v. American General Finance, Inc. (Sept. 17, 1992), 10th Dist. No. 92AP-651, the court noted that R.C. 4141.21 does not confer a privilege. Instead, the statute is an evidence exclusion provision that excludes information the employer furnished to the ODJFS from admission into evidence. The Pasanovic court then went on to state: *Page 27 
 "We do not suggest that the same information, obtained through other means, may not be admissible in a court proceeding. Rather, the statute simply provides that the information actually furnished to OBES is inadmissible in a court proceeding[.]" (Emphasis sic). Pasanovic at *2.
See, also Curry v. Stump's Enterprises, Inc. (Sept. 9, 1980), 10th Dist. No. 80AP-146 (finding that while R.C. 4141.21 did make certain restrictions upon the use of the information supplied to the OBES, it did not provide for an absolute privilege with respect thereto. "There is nothing in the statute that precludes the admissibility of other evidence that a libelous statement was made in connection with the furnishing of information to [OBES]"); Klaus v. Hilb, Rogal HamiltonCo. of Ohio (S.D. Ohio), 437 F. Supp.2d 706 (finding ODJFS records not absolutely privileged where the employer's response to the employee's claim for unemployment compensation is relevant to her claims before the court).
 {¶ 67} Moreover, the cases cited by Appellee are distinguishable from the instant matter as none of them address the admissibility of documents that are simply contained in an ODJFS file, but were also provided to the former employee by the employer in response to a discovery request for personnel records.
 {¶ 68} Appellees cite Barilla v. Patella (2001), 144 Ohio App.3d 524, the Eighth District Court of Appeal in support of their position that the trial court properly excluded Exhibit 16. In Barilla, the court found that communications entered into evidence at a hearing before theODJFS cannot be used in subsequent proceedings. There was no evidence before the court that Exhibit 16 was entered *Page 28 
into evidence during a hearing before the ODJFS. In fact, Appellees' motion in limine simply seeks to exclude documents that aremaintained in the ODJFS file. Interestingly, the Barilla court also cited Pasanovic, which specifically notes that the 4141.21 exclusion does not apply to documents obtained by other means.
 {¶ 69} Appellees also cite Saganowski v. Andersons, Inc., 6th Dist. No. L-03-1168, 2005-Ohio-326, which the court did not permit a witness to be impeached with a prior inconsistent statement made during a hearing before the ODJFS. In Saini v. Cleveland (May 14, 1987), 8th Dist. No. 51913, the court noted in dicta that the privilege extended to communications before the ODJFS and, therefore, should also extend to communications to the EEOC. Neither of these holdings are applicable to the instant matter.
 {¶ 70} Finally, the plain language of the statute supports our holding. Appellant was not seeking to admit documents "maintained by or furnished to" the ODJFS. He was seeking to admit a document provided in response to his discovery requests. Accordingly, we find the trial court's exclusion of Exhibit 16 from evidence to be error. However, we find the error to be harmless based on our holding vis-À-vis Appellant's first assignment of error. Appellant has not cited any authority or made any argument to demonstrate that the admission of Exhibit 16 into evidence would have supported a claim for defamation and/or would have established that Appellees acted in bad faith or with actual malice thereby negating the qualified privilege. Appellant's second assignment of error is overruled. *Page 29 
 {¶ 71} Each of Appellant's assignments of error is overruled and the judgment of the Summit County Court of Common Pleas is affirmed.
Judgment Affirmed
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to Appellant.
 WHITMORE, J. CONCURS *Page 30